**Nolan RICHARDSON, Jr., Plaintiff**

v.

**B. Alan SUGG, President, University of Arkansas, in his official and his individual capacities; John White, Chancellor, University of Arkansas, Fayetteville, in his official and his individual capacities; J. Frank Broyles, Athletic Director, University of Arkansas, Fayetteville, in his official and his individual capacities, University of Arkansas Board of Trustees; and the Arkansas Razorback Foundation, Defendants**

**No. 4:02CV00779–WRW.**

United States District Court, E.D. Arkansas, Western Division.

July 8, 2004.

See also, 220 F.R.D. 343.

John W. Walker, Rickey H. Hicks, Shawn Garrick Childs, John W. Walker, P.A., Little Rock, AR, John T. Lavey, Lavey & Burnett, Little Rock, AR, Robert Peter Pressman, Lexington, MA, Allen P. Roberts, Camden, MA, Claudene Tyler Arrington, Arrington Law Firm, Hope, AR, for plaintiff.

Shannon L. Poore, Kenneth R. Mourton, Esq., Ball & Mourton, Ltd., Fayetteville, AR, Michael R. Jones, Esq., Gilker & Jones, Mountainburg, AR, for Razorback Foundation, Inc., defendant.

Philip E. Kaplan, Kaplan, Brewer & Maxey, P.A., Little Rock, AR, T. Scott Varady, University of Arkansas, Office of the General Counsel, Fayetteville, AR, Jeffrey A. Bell, Esq., University of Arkansas, Office of General Counsel, Little Rock, AR, for B. Alan Sugg, John White, J. Frank Boyles, defendants.

## MEMORANDUM AND ORDER

WILSON, District Judge.

## I. THE PARTIES

The two primary protagonists in this real life drama are Nolan Richardson, Jr., the former Head Basketball Coach at the University of Arkansas, Fayetteville, and J. Frank Broyles, the Athletic Director (AD) of the institution. I list them and the other parties immediately below:

A. Plaintiff Nolan Richardson, Jr., is an African–American who was employed by the University of Arkansas at Fayetteville (UAF) as the men's head basketball coach from 1985 until his firing, which was effective on March 1, 2002. Richardson[1] came to UAF with an outstanding record in the basketball world. He grew up in El Paso, Texas, played college basketball at Texas Western College (now the University of Texas at El Paso), then coached at Bowie High School for ten years. He was then hired as head coach at Western Texas Junior College. There his team there won the National Junior College Tournament in 1980. He was hired as head basketball coach at Tulsa University. His teams there won the 1981 National Invitational Tournament (NIT) and made three appearances in the National Collegiate Athletic Association (NCAA) Tournament. His overall winning percentage at Tulsa was 76.3%.

In 1985, Richardson was hired as the first African–American to serve as a Head Coach at UAF. His achievements at this institution were quite remarkable. His teams went to three NCAA Final Four tournaments (1990, 1994, 1995), won the National Championship in 1994, and then returned to the title game the next year. In 1991, his team made the Elite Eight, and two of his other teams went to the Sweet Sixteen (1993, 1996). His UAF teams went to the NCAA tournament thirteen out of seventeen seasons. They also won numerous conference championships. His overall record at UAF was 389–169, a winning record of nearly 70%.

In 1994, Richardson was named National Coach of the Year by Chevrolet, the National Association of Basketball Coaches (NABC), and other organizations. The Razorback basketball team was recognized by the media as "the team of the 90's."

---

1. The parties and other witnesses will sometimes be referred to by their last names only. No disrespect whatsoever is intended.

B. Defendant J. Frank Broyles, a Caucasian, has been AD at UAF since 1973. He started as Head Football Coach at UAF in 1958, and from 1973 to 1976, he was both head football coach and AD.

Broyles was an outstanding coach. As an example, his 1964 team went 11–0 and won the National Championship. When he came to UAF, it was what was commonly known as a "football school"—other sports were decidedly secondary. During his tenure as AD, the entire sports system at UAF enjoyed spectacular success. Bud Walton Arena and Donald R. Reynolds Stadium—built during Broyles' tenure as AD—are among the finest athletic facilities in the country. Broyles has also excelled at fundraising, which is necessary to keep the Athletic Department self-sustaining.

C. Defendant B. Alan Sugg, a Caucasian, is the President of the University of Arkansas system. He has held the position since 1990, and reports to Defendant Board of Trustees, the governing body of the University of Arkansas system. His office is in Little Rock, Arkansas.

D. Defendant John A. White, Jr., a Caucasian has been the Chancellor UAF since 1997. He reports to the University President Sugg.

E. Defendant The Razorback Foundation, Inc. (Foundation) is an Arkansas non-profit corporation which has existed since 1988. Its assets now exceed $200 million, with approximately $25 million in cash reserves.. An earlier version known as the Razorback Scholarship Fund was created in the 1970s. The organization financially supports the UAF men's athletic program. The Foundation was dismissed from this lawsuit in a separate order and judgment has been entered today.

2. FED. R. CIV. P. 38.

## II. BACKGROUND AND GENERAL OBSERVATIONS

Plaintiff alleges that he was fired because of his race, and because he spoke out on matters of public concern (race). If he proves either of these allegations, Plaintiff prevails because the University Defendants would be guilty of violating rights secured to him by the First Amendment to the United States Constitution and 42 U.S.C. § 2000(e) *et seq.* (Title VII).

The trial in this case began May 5, 2004, and concluded June 3, 2004. There were 18 days of testimony and 44 witnesses, resulting in more than 4,000 pages of testimony, and nearly 300 exhibits.

This case was tried without a jury. Under the Constitution and federal statutes, the parties were entitled to a jury trial with regard to most of the issues. Rule 38 of the Federal Rules of Civil Procedure provides, in part, that:

> Any party may demand a trial by jury of any issue triable of right by a jury by serving upon on the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue.... [2]

This generally means that a written demand for a jury trial must be served within ten days after an answer to a complaint is filed.

Subsection (b) of Rule 39 of the Federal Rules of Civil Procedure states:

> Issues not demanded for trial by jury as provided in Rule 38 shall be tried by the Court; but, not withstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the Court in its discretion upon motion may order a trial by jury of any and all issues.[3]

3. FED. R. CIV. P. 39(b).

Parties sometimes forget to file a demand for a trial by jury. So far as I can recall, I have never failed to impanel a jury when requested by a party, even though the demand was tardy. This is primarily because, in my view, trial by a randomly-selected jury is the essence of government reposed in the people.

Before selecting a jury, I always remind prospective jurors that we have the greatest justice system in the world. In fact, I believe we have the best justice system that has *ever* existed in the world. And I believe this primarily because citizens, both individual and corporate, have a right to a trial by a randomly selected jury. The United States is the only country in the world that affords its citizens this right.

When the parties make a considered decision to waive a jury—as the parties have done in this case—it places an awesome responsibility on the judge. In a jury trial there are two judges. The jury is the *sole* judge of the facts, and the trial judge is the *sole* judge of the law. This means the jury must find the facts, subject only to its sworn duty to follow the law, as given in the judge's instructions.

A witty (and arguably very wise) English barrister of yesteryear observed, "A judge is but a juror in ermine skin robes." It is obvious that, in a non-jury trial, the two judging duties are rolled into one. That means both declaring the law and finding facts are assigned to the juror in the cloth robe—in this instance—me.

At the commencement of a jury trial I instruct the jurors:

> From the evidence you will decide what the facts are. You are entitled to consider that evidence in the light of your own observations and experiences in the affairs of life.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness says, or only part of it, or none of it.
>
> In deciding what testimony to believe, consider the witnesses' intelligence, their opportunity to have seen or heard the things they testify about, their memories, any motives they may have for testifying in a certain way, their manner while testifying, whether they said something different at an earlier time, the general reasonableness of the testimony and the extent to which their testimony is consistent with other evidence that you believe.[4]

The same rules apply to a judge when sitting as a jury.

During this trial, I was sometimes faced with apparent conflicts in the testimony, and some items of evidence seemed to be left dangling. This caused me to think back to a book I read long ago. In *Helter Skelter*, Vincent Bugliosi's book about the Manson murder trial, he wrote:

> In literature a murder scene is often likened to a picture puzzle. If one is patient and keeps trying, eventually all the pieces will fit into place.
>
> Veteran policemen know otherwise. A much better analogy would be two picture puzzles, or three, or more, no one of which is in itself complete. Even after a solution emerges—if one does—there will be left over pieces, evidence that just doesn't fit. And some pieces will always be missing.[5]

---

4. 8TH CIR. CIVIL JURY INSTR. 1.01 (2001).

5. VINCENT BUGLIOSI, HELTER SKELTER: THE TRUE STORY OF THE MANSON MURDERS 17 (25th Anniversary ed.1994) (1974).

The same is true of civil trials. Humans are not given the ability to recreate a past event perfectly. But perfection is not required. As will be explained in more detail below, the party with the burden of proof must prove that his version of the fact is more likely true than not.

This case was tried by talented and spirited lawyers. The parties hold strong views of their respective positions. There are, without question, equities on both sides. Added to that equation is the requirement that I view the facts within governing legal constraints as I understand them to be, and not necessarily as I wish them to be. This is a long way of saying this case has been hard to decide. Judging, like coaching, often appears easier from the bleachers.

In a criminal case, the prosecution must prove its case beyond a reasonable doubt—not beyond all doubt, and not to a mathematical certainty, but beyond a *reasonable* doubt. In civil trials the burden is not as heavy. A plaintiff must prove his case by the greater weight of the evidence, or as sometimes stated, by a preponderance of the evidence—or as lawyers like to tell juries, "by 50.1% of the weight of the evidence." If the evidence on an issue is of equal weight, then the party with the burden of proof fails.

There are many reasons why a party may waive a jury. In this case we have savvy, highly motivated parties with good lawyers who I am sure have "fully advised them in the premises" (as we lawyers are wont to put it). I consider it an honor that they have placed their case in my hands.

## III. LEGAL ISSUES WHICH GOVERN THE EXAMINATION OF THE EVIDENCE

### A. Whether Defendants are entitled to the "Same Actor Presumption"?

■ Defendants argue that they are entitled to the "same actor presumption." This presumption was first recognized by the Fourth Circuit in *Proud v. Stone*,[6] an age discrimination case. In *Pound*, the court explained this concept as follows:

In cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action.[7]

The Eighth Circuit adopted the "same actor presumption" in *Lowe v. J.B. Hunt Transport, Inc.*,[8] another age discrimination case. The Sixth Circuit extended the presumption to *race* discrimination cases in *Buhrmaster v. Overnite Transportation Company*,[9] This presumption means that, in such cases, the court should view the evidence and draw a strong inference of no discrimination.

In this case, the presumption, or more precisely, the right to a strong inference that there was no discrimination in the firing of Plaintiff because Defendant Broyles hired him is not applicable. First, Defendants take the position that Broyles was not the decision maker in the firing. If that is true, there would be no right to the presumption because it does not extend, in any case, to the next supervisor. Second, even if I were to find that Broyles made the decision to fire Plaintiff, 17 years between the hiring and firing would not fit

6. 945 F.2d 796 (4th Cir.1991).

7. *Id.* at 797–98.

8. 963 F.2d 173, 174 (8th Cir.1992).

9. 61 F.3d 461, 464 (6th Cir.1995).

within the "relatively short time span" requirement.

## B. Whether the head basketball coach and head football coach at UAF are "similarly situated" positions?

■ To establish a *prima facie* case of race discrimination,[10] Plaintiff must prove that he was treated differently than a *similarly situated* employee who is not a member of the protected class, Here, Plaintiff compares his treatment with that of UAF's head football coach, Houston Nutt. Defendants have taken the position that the two positions are not similarly situated, and rely on *Harvey v. Anheuser-Busch, Incorporated,*[11] *Lynn v. Deaconess Medical Center–West Campus,*[12] *Clark v. Runyon,*[13] *Horn v. University of Minnesota,*[14] and an unpublished opinion from the Sixth Circuit, *Murphy v. University of Cincinnati.*[15]

I have reviewed these cases, but I believe that, when applied to the facts of this case, they support a finding that the positions of head football coach and head basketball coach *are* similarly situated. This finding is based on the following:

1. The Arkansas General Assembly has determined that the line-item budget expenditure for both the head football coach and the head basketball coach is $136,473.[16]

2. Basketball and football at UAF are both revenue-producing sports.

3. The University Board Policy Number 1707 (Policy) governing post-season participation treats both basketball and football the same.[17] According to Policy, both coaches receive the same bonus for post-season events.[18] Only the basketball and football coaches may receive additional compensation for outstanding effort in accomplishing the goals of the Athletic Department for outstanding effort.[19] The Policy deals with other sports separately.[20]

4. Post-season incentives are restricted in the employment contracts of both head coaches by the board Policy.[21]

5. Chuck Dicus, President of the Foundation and a former All–American

---

**10.** The term *prima facie* is a Latin phrase meaning that a fact is presumed to be true unless disproved by some evidence to the contrary. BLACK'S LAW DICTIONARY 1189–90 (6th ed.1990), In employment discrimination cases, it is used as a term of art, setting out the initial burden of proof that a plaintiff must meet before the defendant is required to produce any evidence at all. For instance, in a firing case, the plaintiff would have to show that: (1) he was a member of a protected class; (2) he was qualified to do the job; (3) he was terminated; and (4) the employer continued to try to fill the position. Courts have ruled that it is not a heavy burden, and the facts sufficient to make a *prima facie* showing vary from case to case. Only after this initial burden is shouldered must the employer, "articulate a legitimate non-discriminatory reason" for the firing. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**11.** 38 F.3d 968 (8th Cir.1994).

**12.** 160 F.3d 484 (8th Cir.1998).

**13.** 218 F.3d 915 (8th Cir.2000).

**14.** 362 F.3d 1042 (8th Cir.2004).

**15.** 72 Fed.Appx. 288, 2003 U.S.App. LEXIS 15319 (6th Cir.2003).

**16.** Pl.'s Ex. 50.

**17.** Pl.'s Ex. 11.

**18.** *Id.* at ¶ 1–2

**19.** *Id.* at ¶ 5.

**20.** *Id.* at ¶ 4.

**21.** Jt. Exs. 5, 9.

football player at UAF, testified that the football and basketball coaches are similarly situated for purposes of compensation. The Foundation guarantees the major portion of both coaches' salaries.

6. Kevin Scanlon, a former Razorback football star and current sports manager for Stephens' Sports Management, Incorporated, testified that while some schools are only one-sport schools. UAF, however, enjoys nationwide prestige in both football and basketball. Further, he testified that the basketball program at Arkansas enjoyed more prestige than football, during the 1990s.

7. John McDonnell, the renowned track and field coach at UAF, acknowledged that football and basketball were set above the other sports at UAF.

8. While there is a difference in revenue production between the two sports, that difference is explained by the differences in the size of the arena facilities, the sky-box income, and in the SEC monetary turn back.

9. During Richardson's tenure, the football program had peaks and valleys. When Richardson began his employment at UAF, Ken Hatfield was the head football coach. During Hatfield's tenure, football enjoyed great success. After Hatfield left in 1989 and until the late 1990s, the basketball program was at the height of its success and the football program struggled. When all is said and done, both sports are major programs with national reputations.

10. The salaries of the two coaches also heavily support the finding that the two positions are similarly situated. At the time Richardson was fired, the head coaches' salaries for basketball and football were the highest in the Athletic Department, $1.3 million and $800,000, respectively. I find it compelling that Plaintiff has, at all relevant times, been paid a higher salary than the head football coach.

The law provides that, "whether two jobs are substantially equal requires a practical judgment on the basis of all the facts and circumstances of a particular case, including factors such as level of experience, training, education, ability, effort, and responsibility." [22] There is no evidence to support a finding that these positions differ in regard to educational requirements, ability, effort, responsibility, or experience. Defendant Broyles offered distinctions between the specific job tasks of each (football has more players, more assistant coaches, a larger space in which to coach), and suggests that coaching football was more difficult than coaching basketball, I find this argument unpersuasive and unsupported by other testimony, expert or otherwise. Although Broyles was a three-sport athlete at Georgia Tech (football, basketball, and baseball), he has coached only football. I suspect that this fact may color his view on this point. One could view facts differentiating the sports in a contrary fashion by emphasizing that basketball covers two semesters rather than one; it requires superior recruiting because of the smaller number of scholarships; and, there are fewer assistant coaches, so the head coach has more responsibility. When you shuck it all down, the facts in this case show that the two positions are substantially similar.

At Defendants' urging, I have considered *Murphy v. University of Cincinnati*.[23] unpublished three-judge opinion of the Sixth Circuit. In *Murphy*, the plaintiff, an

---

22. *Horn*, 362 F.3d at 1045.

23. 72 Fed.Appx. 288, 2003 U.S.App. LEXIS 15319 (6th Cir.2003).

assistant swim coach, compared herself to the assistant diving coach, a man who was in his twenty-second year at UC who had earned eight various coach-of-the-year awards and had coached nineteen All–Americans and one Olympian. Those facts differ greatly from the facts here. While it appears that Coach Nutt is on his way, at this point he has not won a National Championship or a BCS bowl game. According to Kevin Scanlon, only Richardson has achieved the status of a "seasoned coach." Courts have made it clear that a finding that persons are similarly situated does not require that their positions are identical.[24] All in all, there has been no showing that these positions require appreciably different types and degrees of skill and responsibility.[25]

Finally, *Harvey v. Anheuser–Busch*[26] is not helpful in determining whether these two positions are similarly situated. The similarly situated language relied on in *Harvey* refers to lower-level employees, not head coaches, "who are involved in or accused of the same offense and are disciplined in a different way."[27] The *Harvey* court was not concerned with whether two positions which are similar for purposes of pay or prestige. Additionally, because of the serious nature of the employee misconduct in *Harvey*, and because the court was affirming a grant of a summary judgment, the quotes are not really on point, and could lead to less than careful legal analysis. Here, whether Coach Nutt's and Coach Richardson's positions were similarly situated was left to the trier of fact— me. After considering all of the evidence I find that the basketball and football coach-

ing positions at the UAF were substantially similar at the time of Plaintiff's firing.

**C. Whether Broyles' use of the word "nigger" at the *Hawgs Illustrated* banquet should be viewed as a "stray remark" or as direct evidence of racial animus.**

 It is important to consider the context in which Broyles' statements were made.

Broyles and Richardson talked about Richardon's duties, or lack of duties, as AAD. On December 20, 1999, Richardson wrote Broyles complaining that he did not want to be a "token" AAD. He attached a copy of a press release citing a study of the substantial racial disparity in the numbers of African–Americans employed in intercollegiate athletic departments. The study, released December 9, 1999, excluded traditionally black schools. It found that, of 899 NCAA schools, only 125 of the 2,498 people who held the three core management titles were black. The essence of Richardson's letter was simply that he did not want to be counted for purposes of affirmative action if he did not have substantive duties.[28]

On December 23, 1999, Broyles wrote Richardson that he would respond after the holidays.[29]

On January 15, 2000, Richardson, during a press conference, complained again about his "token" status as AAD, stating that he should not be counted among the 5 percent of African–Americans holding core position in management in the National Association of Black Colleges (NABC) study because he had no duties and received no additional pay. Richardson's complaints were reported in the *Arkansas Democrat–Gazette*[30] on January 15, 2000.

---

24. *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998).

25. *Horn,* 362 F.3d at 1045–46.

26. 38 F.3d 968 (8th Cir.1994).

27. *Id.* at 972.

28. Pl.'s Ex. 58.

29. Jt. Ex. 45.

30. Pl.'s Ex. 59.

On January 17, 2000, Richardson again complained about the issue in an article in the *Springdale Morning News*. When reminded by the reporter that other Caucasian AAD's had not been "overly involved" in administrative duties, Richardson responded that:

> Those guys can go ahead and stay that way because they've got guys their color doing things for them. What about me? Who sits in that hall way up there to represent us? I don't. Do I help make decisions? No, sir. I've never been asked a question, I've never been in a meeting. So why use me as an AAD for affirmative action? I'm not an Uncle Tom.[31]

On January 25, 2000, with still no response from Broyles, Richardson wrote a second letter to him, this time complaining about the disparity in pay between his assistant coaches and the assistant football coaches. In this letter, Richardson reminded Broyles that he had raised the issue in a 1997 letter, and that the disparity in pay had become even greater since Nutt had replaced Ford as head football coach in 1998. In 1997, Broyles had justified the difference by citing experience. Richardson reminded Broyles that, with the passage of time, his assistant, Mike Anderson, now had greater experience than any of Nutt's assistants, so experience could no longer be used to justify disparate treatment.[32] Richardson copied both Defendants White and Sugg.

On February 17, 2000, Broyles responded to Richardson's letter and admitted that there were pay disparities between assistant football coaches and assistant basketball coaches. This time, Broyles attempted to justify the pay disparity, not because of experience, but because it was "required by the marketplace." [33] Broyles also sent copies of his letter to Sugg and White with a cover letter to them stating that matters of this nature should be resolved between head coaches and the AD. Broyles commented further that, by sending Sugg and White a copy of his letter, Richardson followed "inappropriate protocol." [34] Richardson was not copied with Broyles' cover letter to Sugg and White.

That same day, Richardson called Wally Hall, the Sports Editor for the *Arkansas Democrat–Gazette* to complain about the manner in which the *Democrat–Gazette* had portrayed his son's involvement in the departure of a basketball player. Richardson testified that, during this conversation, he called Wally Hall a "redneck."

The next day, February 18, 2000, Hall described this conversation in his column, and wrote that Richardson had called the fans "redneck SOB's." [35] That morning, after reading the article, Jim Lindsey, a former member of the UAF Board of Trustees and the Foundation, and a former star player for Coach Broyles, received a call from a Caucasian Razorback fan in eastern Arkansas, who reported that the "redneck-SOB" statement had caused a firestorm among fans in Eastern Arkansas. Lindsey, Broyles' friend and confidant, called Broyles, to discuss the article and the phone call. Lindsey told Broyles that he believed the statements justified terminating Richardson for cause.[36]

---

**31.** Pl.'s Ex. 2.

**32.** Jt. Ex. 67.

**33.** Pl's Ex. 68.

**34.** Jt. Ex. 69.

**35.** Richardson has at all times disputed Hall's interpretation of the conversation, and Hall conceded in his testimony that whether Richardson was talking about the fans was not entirely clear.

**36.** Broyles' memory of the conversation does not include a discussion of termination.

That same night, *Hawgs Illustrated*, a Razorback fan magazine published by Clay Henry,[37] held a banquet to honor senior Razorback football players. Broyles sat at the table with Henry, Paul Eells (sports anchor for the local ABC Affiliate, KATV and Host of the TV show "Rollin' with Nolan"), and Nate Allen (sportswriter), among others, all of whom are Caucasian. According to Henry, during the dinner, Broyles asked Henry if he would do a column in *Hawgs Illustrated* equating Richardson's calling a fan a "red-neck SOB" to a Caucasian person calling Richardson a "nigger." [38] Henry testified that he was surprised at Broyles' use of the word "nigger" and at Broyles' request that Henry write the column. He told Broyles that *Hawgs Illustrated* had an aversion to controversy.

Henry also testified that Broyles spoke loudly and in an animated manner when he used the racial epithet. Concerned that the African–American players sitting at the next table might overhear Broyles, Henry touched Broyles' hand and urged him to lower his voice. Later that evening, Broyles again raised the issue and again suggested that an article be written in Henry's publication comparing the two terms. According to Henry, Broyles stated that the comparison should not be attributed to him.

Henry later told Richardson about Broyles' racially charged statement. With his permission, Richardson tape recorded Henry's statement.[39] At trial, Henry confirmed the accuracy of his taped statement and recalled that Broyles quoted someone else as the source for the "redneck SOB" v. "nigger" comparison.

Paul Eells was seated by Coach Broyles at this banquet. Although Eells was not engaged in conversation with him at that time, Eells clearly heard the part regarding "redneck SOB's" and "niggers." Eells testified that he was shocked. He also testified that he heard it as a direct statement by Broyles, and not as Broyles' quoting someone else. Eells pointed out, however, that he was not engaged in the conversation with Broyles when he heard the word "nigger." Whether a quote or a direct statement, Broyles testified that he regretted making the remark.

It should ring out loudly and clearly—an African–American calling a Caucasian person a redneck is nowise the same as a Caucasian person calling an African–American a "nigger." Although some may argue that there is no real difference, they are wrong, and I suspect they know it. I think the following analysis makes this point well:

> What about words like "honky," "redneck," and "cracker?" While those words can be harmful epithets in certain contexts, some have argued that such words are not comparably damaging to whites as are epithets hurled against people of color and other so-called minorities. In the view of two commentators:

> The word "honky" is more a badge of respect than a put down. "Cracker," although disrespectful, still implies power, as does "redneck." The fact is that terms like "nigger," "spick," "faggot,"

---

37. Clay Henry is the son of longtime sports writer, the late Orville Henry.

38. During the trial, there was conflicting testimony as to whether Broyles made the comparison himself, or whether he was quoting someone else. From his testimony, it is clear that the distinction is quite important to him.

If there is any difference from a legal standpoint, however, it is too small to count. Incidentally, Coach Broyles testified that this was the only time he had uttered the word "nigger" in his entire life.

39. Pl.'s Ex. 51.

930

and "kike" evoke and reinforce entire cultural histories of oppression and subordination. They remind the target that. his or her group has always been and remains unequal in status to the majority group. Even the most highly educated, professional class African–American or Latino knows that he or she is vulnerable to the slur, the muttered expression, the fishy glance on boarding the bus, knows that his degree, his accomplishments, his well-tailored suit are no armor against mistreatment at the hands of the least educated white.

But not only is there no correlate, no hate speech aimed at whites, there is no means by which persons of color and others can respond effectively to this form of speech within the current paradigm. Our culture has developed a host of narratives, mottoes, and presuppositions that render it difficult for the minority victim to talk back in individual cases, and to mobilize effectively against hate speech in general. These include: feelings are minor; words only hurt if you let them; rise above it; don't be so sensitive; don't be so humorless; talk back—show some backbone. Stated or unstated narratives like these form part of the linguistic and narrative field on which minority victims have to play in responding to taunts and epithets, and of course limit the efficacy of any such response.[40]

Defendants have argued that Broyles' banquet comments two years before the firing are "too remote" and "stray" to support an inference that Broyles harbored racial hostility toward Richardson. They argue that his remarks are, therefore, insufficient to constitute direct evidence of discrimination because there was no causal link between the remark and the firing. They rely on *Simmons v. Oce–USA, Incorporated.*[41] Finally, at closing arguments, Defendants maintained that I should rely on a recent plurality opinion of the Eighth Circuit Court of Appeals in *Jackson v. Flint Ink North American Corporation.*[42] I disagree.

In this instance, the issue is not Broyles' words themselves, but his apparent desire to use race in a publication which would create conflict among fans and garner support for firing Richardson. I credit the testimony of Clay Henry that Broyles solicited an article making the comparison and can think of no other reason why he would do so. Henry had something to lose for his honesty. Broyles had already attempted to get support for firing Richardson as early as February 2000. This solicitation can hardly be seen as anything but a willingness to "stir the racial pot."

Broyles denied soliciting the article, but Henry's testimony was unequivocal, and he had given an earlier tape-recorded statement to this effect. Even if I were to assume that such a story was not solicited, there is no question that Broyles was animated when making the statement that he knew he was sitting between two news media persons, that there was no contention that their conversation was "off the record." Henry testified that he asked Broyles if he wanted to be quoted as a source in the requested article, and Broyles responded with the equivalent of "perish the thought."

These statements were made at a time when Broyles, a decision maker, was considering Richardson's termination. I find

**40.** Ronald Turner, *Regulating Hate Speech and the First Amendment: The Attractions of and Objections to, an Explicit Harms–Based Analysis,* 29 Ind. L. Rev. 257, 292 n.242 (1995).

**41.** 174 F.3d 913 (8th Cir.1999).

**42.** 370 F.3d 791 (8th Cir.2004).

that this is direct evidence of discrimination and is sufficient to require a mixed motive analysis of any employment decisions made by Broyles before October 2000 when the contract containing the release clause was signed.

■ This "mixed motive analysis," first set out in *Price Waterhouse v. Hopkins*,[43] caused a host of problems that led to the 1991 amendments to Title VII. These amendments set forth the statutory requirements for "mixed motive cases," or cases in which a plaintiff demonstrates that race was "a motivating factor."

According to the amendments, once a plaintiff establishes that race was *a* motivating factor, the employer "must demonstrate that it would have taken the same action in the absence of the impermissible motivating factor."[44] The word "demonstrate" is defined as "meets the burdens of production and persuasion."[45] (This means that both the burden of both proof and persuasion shift to the employer.) Finally, the amendments provide that, rather than avoiding all liability by proving that it would have made the same decision despite the illegitimate factor, the employer can avoid liability only for monetary damages.[46] Thus, even if the employer proves it would have fired the employee in any event, the court may grant declaratory and injunctive relief and attorneys' fees.

I have considered *Jackson v. Flint Ink North American Corporation*,[47] a recent hostile work environment case, which was brought to the Court's attention by Defendants during closing argument. Although I disagree with the plurality opinion in *Jackson*, and agree with the dissent, it is of no moment. Hostile work environment cases are those in which there is no tangible employment action such as a firing.[48] Direct evidence of discrimination is viewed differently in cases which culminate in a tangible employment action.

The Plaintiff argues that this direct evidence that race was a motivating factor should survive the release provisions in Richardson's contract signed in October 2000. However, for the reasons set forth in this opinion, I disagreed and will not view the evidence against Broyles after 2000 under the mixed motive analysis.

## IV. THE DATE OF THE DECISION TO FIRE RICHARDSON

There was much testimony and dispute regarding the question of when the decision was made to fire Richardson.[49] This fact governs how I must view the evidence on the issue of pretext in the race discrimination claim. Additionally, it defines which statements I must examine to determine whether Richardson's speech was protected by the First Amendment. Here, I examine the relevant evidence and make the required fact finding.

**43.** 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

**44.** 42 U.S.C. § 2000e–5(g)(2)(B).

**45.** 42 U.S.C. § 2000e(m).

**46.** 42 U.S.C. § 2000e–5(g)(2)(B)(ii).

**47.** 370 F.3d 791 (8th Cir.2004)

**48.** No affirmative defense is available when a supervisor's harassment culminated in tangible employment action such as discharge, de-

motion, or undesirable reassignment. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762–74, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

**49.** Defendants contend that on Sunday, February 24, 2002, the final decision was made to buy out Richardson's contract and to offer him an opportunity to resign—or be fired. Richardson prefers to refer to the "termination scenario" as a "firing." While he may not be technically correct down to a gnat's eye, it looks like a firing to me, and will accommodate him on this semantical point.

Defendants' position is that the decision to fire Richardson was made on Sunday, February 24, 2002. To support this, Lindsey, Scharlau, Clark, May, Reed, and George, UAF trustees, at the time of the firing, all testified with a great deal of certainty that President Sugg called each of them on Sunday, February 24, 2002, and informed them that, because of Richardson's comments during his press conference on February 23, 2002, immediately after the Kentucky game, Broyles and White had decided to fire him. Each board member who was contacted that Sunday evening testified that he concurred in the decision to terminate Richardson's employment. UAF trustee Jay Dickey testified that he was informed of the decision on Monday, February 25, 2002, before Richardson's press conference on that date.

Dr. Sugg used his telephone records to validate his testimony that the calls were made on Sunday. In addition to this testimony, three members of White's staff testified that they were told of the decision on Monday morning and were told to keep the information confidential.

Dr. Joe Hargrove, UAF's only African-American trustee, was not contacted that Sunday night. Dr. Sugg testified that he attempted to contact Dr. Hargrove but was unable to reach him. Hargrove testified that he was out of town and did not have an opportunity to talk to Sugg until Thursday afternoon, February 28, 2002. Hargrove testified that he understood that the firing of Nolan Richardson was merely "in the offing," but he was not told that a decision had been made. Further, Hargrove testified, he told Sugg that he did not believe Richardson should be fired.

In addition to Hargrove's testimony, Plaintiff presented additional inconsisten-

cies regarding the timing of the firing. First, on February 24, 2002, when White initially heard about the "pay me my money" comment from reporters at a UAF track meet, he stated that he believed Richardson had made the remark in the "heat of the moment." Plaintiff also points to inconsistencies in White's chronology of events regarding both who made the decision and when the decision was made.[50] The most damaging testimony to White's position is a tape recording of a television broadcast on February 27, 2002, in which White denied any knowledge of a buyout.[51]

And finally, Plaintiff points to a letter from the University's general counsel dated March 5, 2002, stating that Broyles and White believed that Richardson's comments on February 22, 23, and 25, 2002 indicated that Richardson desired a buyout.[52] This letter is troubling.

After hearing all of the testimony and reviewing all of the documents, I believe that the preponderance of the evidence is that on Sunday, February 24, 2002, UAF made the decision that Richardson was not to continue as head basketball coach. In all, thirteen witnesses testified that the decision was made on Sunday, February 24, 2002. I agree with the testimony of McKissick that this termination was mishandled. Additionally, I agree with Chancellor White that waiting until February 28, 2002, to advise Coach Richardson of the decision was not only unfair, but an administrative nightmare.

## V. GENERAL REVIEW OF EVIDENCE OF RACE DISCRIMINATION

During the trial much time was spent focusing on evidence regarding Richard-

50. Pl.'s Exs. 47, 48.

51. Pl.'s Ex. 75.

52. Pl.'s Ex. 10.

son's allegations of race discrimination, both before and after October 12, 2000 (the date of the execution of Richardson's contract containing the release language). I ruled in an order dated March 30, 2004, that all claims existing as of October 12, 2000, were released for remedial purposes [53] But I also held that pre-October 12, 2000 evidence could be used to show intentional discrimination.

Race discrimination is usually difficult to prove. The Honorable Richard Posner of the Seventh Circuit Court of Appeals has written persuasively on the potential damaging effects of evidentiary exclusions in employment discrimination cases, in which the plaintiff faces the difficult task of persuading the fact-finder to disbelieve an employer's account of its own motives. In *Riordan v. Kempiners,*[54] Judge Posner wrote:

> Proof of such discrimination is always difficult. Defendants of even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it; and because most employment decisions involve an element of discretion, alternative hypotheses (including that of simple mistake) will always be possible and often plausible .... A plaintiff's ability to prove discrimination indirectly, or circumstantially, must not be crippled by evidentiary rulings that keep out probative evidence. because of crabbed notions of relevance or excessive mistrust of juries.[55]

Rarely are employment decisions made based on one fact. So, the historical context of decisions is beneficial to the fact finder.

There is evidence upon which Plaintiff could believe he was treated differently before 2000. And on the surface, at least, it appears that good things just seemed to happen to Nutt, while Richardson had to fight for things. However, in most instances, Richardson eventually got what he wanted.

Here, I address evidence to which I have given serious attention. I believe the allegations described in this section, if found to be true, would allow a reasonable fact finder to infer discrimination; and, if such inferences are made, would benefit Plaintiff in establishing the circumstantial evidence required to prove intention.

First, I address the evidence regarding Richardson's allegations that he was discriminated against as an AAD. I do not believe that Plaintiff was treated differently than other AAD's. The evidence clearly shows that the position was in name only, and that all other Caucasians who held the position had no additional duties, authority, or increased pay.[56]

█ Second, I have examined Plaintiff's allegations that his assistant coaches were paid less than the assistant football coaches as evidence of race discrimination. In December 1999, Richardson wrote Broyles and complained that his assistant coaches were paid less than assistant football coaches. Richardson testified that Broyles told him when he was hired in 1985 that the assistant football and basketball coaches would be paid the same.

Defendants do not deny that Broyles may have made the statement, but argue that they cannot be bound by it because of circumstances which have changed the market and dramatically altered the pay of assistant football coaches.

I do not believe that Richardson met his burden of establishing that the assistant coaching positions are similarly situated.

---

53. See Doc. No. 96.

54. 831 F.2d 690 (7th Cir.1987).

55. *Id.* at 697–98.

56. John McDonnell, Eddie Sutton, Rick Schaeffer, and others.

Both Nutt and Broyles testified that, in recent years, the salaries of assistant football coaches have skyrocketed because professional teams recruit assistant football coaches from the ranks of college assistants. With salaries of the professional teams significantly higher salaries, the market has accelerated the amount of money necessary to retain assistant football coaches. Thus, I cannot make inferences of race discrimination based on the pay disparity between assistant football and basketball coaches.

Third, I have reviewed the allegations of contract disparity. Defendants admit that in 1997 and 1998, Nutt received a greater amount of income from the University and the Razorback Foundation than did Richardson.[57] However, the proof regarding the "all schools" contract, allowing Reebok to pay different coaches under separate consulting arrangements, and Nutt's not being in a position to negotiate a separate contract, required Nutt's compensation to be paid from other sources. The total compensation paid to Nutt was in keeping with that paid other head football coaches in the Southeastern Conference.

I am convinced by the testimony of both former ADD Katherine Hill and Kevin Scanlon, that the market forces and opportunity to capitalize on the shoe and apparel industry dramatically changed during the mid- to late–90's. Therefore, it seems that a comparison of the sources of income alone is not conclusive evidence of disparate treatment.

I am further convinced, when comparing the contracts as a whole,[58] that Richardson's overall contract is more favorable. I base this conclusion on the following facts: Richardson's contract was guaranteed without performance incentives; Nutt's contract contained a buyout disadvantage;

Richardson's contract had a less restrictive clause relating to graduation rates; and the singularly unusual clause in Richardson's contract that required the Chancellor's decision for firing with a review of that decision by the President. Scanlon, Richardson's agent, agrees.

I think that Richardson believed his contract was less attractive. Richardson testified that he believed the length of Nutt's contract demonstrated UAF's commitment to Nutt and his job security. Richardson's position on this issue was reasonable, and formed a reasonable basis for his belief that Nutt was treated with preference. However, based on the testimony of Scanlon, my review of the contracts, and the exhibits regarding deferred compensation, together with the respective vesting plans, I am persuaded that Richardson had the better contract.

■ Fourth, Richardson testified that the UAF's attempt to require graduation goals in his contract is evidence of race discrimination. It is true that until the negotiations with Richardson in 1999, coaches' contracts had not addressed the issue of graduation rates. Richardson objected to the inclusion of graduation rates, and was quite vocal about his belief that, while he had a responsibility to encourage his players to achieve academically, the responsibility did not end with him. On many occasions, he explained, academic achievement also required the commitment of the parents, the institution, and most of all, the players.[59] Additionally, it appeared to Richardson and others that the graduation rates of basketball players, a sport dominated by African–Americans, was being singled out. It was his public speech on this issue at a Pine Bluff Razorback fan club meeting that was perceived as inappropriate by Board of Trustee

---

57. Defendants' post-trial finding no. 110.

58. Jt. Ex. 89–93.

59. Pl.'s Ex. 74.

member Tommy May, White, and Sugg. In any event, the testimony was consistent that the manner in which Richardson delivered the speech was perceived to be inappropriate.

Richardson's position on the issue of graduation rates for basketball players had a great deal of support from African–American alumni. In support of his position, Plaintiff presented the testimony of the Honorable Wendell Griffen.[60] I find it significant that Judge Griffen has a formal background in diversity training from the United States Army, where in 1974 he graduated from its race relations school at Fort Benning, Georgia. In 1975, Judge Griffen graduated from the United States Defense Relations Institute, which was the premier school used by the Department of Defense for training race relations staff members on diversity issues.

Judge Griffen also testified that he drafted the bylaws for the Black Alumni Society (BAS) of the Arkansas Alumni Association. Judge Griffen summarized the complaints the BAS has received and communicated to UAF, since 1989, regarding the "lack of African–American presence and diversity within the Athletic Department." Judge Griffen specifically referred to a March 17, 2000 e-mail that he sent to White complaining about newspaper reports that the delay in the signing of Richardson's contract was related to "evaluating" his performance on the basis of graduation and retention rates. According to Judge Griffen, no reasonably informed person would deem graduation and retention rates to be the controlling factor in deciding whether Richardson's contract should be renewed.

Gene McKissick, an African–American lawyer in Pine Bluff and member of the

Board of Directors also testified. He stated that, in 2000, BAS made complaints to White regarding the treatment of Richardson. At that time, he added there was a bigger concern. This was the absence of African–Americans in the administration, and, more particularly in the Athletic Department.

Both McKissick and Griffen testified about a meeting they had with White to discuss the graduation rate issue. McKissick testified that he attempted to get White to compare the graduation and retention rates of baseball and basketball players, but White refused. He also testified that he believed that White wanted graduation rates to be a condition of Richardson's employment. However, McKissick admitted that he was not familiar with the provisions regarding graduation rates in the contract of the head baseball coach.

Voices are strong on both sides of the aisle on this issue. Many argue that intercollegiate sports have become a big business, and that many players only attend college for a chance at playing professional sports. Others argue just as vigorously that even the super-talented athlete must be equally interested in a college degree. The testimony reflects that UAF's administration, and particularly White, feel strongly that graduation rates should be part of the coaches' evaluations and contracts. The contracts of Richardson and Nutt both have language regarding efforts which must be taken to encourage graduation. Arguably, the language in Richardson's contract is less restrictive.

If there is racial disparity regarding baseball athletes and the graduation requirements of baseball coaches, that evidence was not introduced by either party, and it was Plaintiff's burden to do so.

**60.** Judge Griffen sits on the Arkansas Court of Appeals and has done so since 1996. He graduated from high school in 1968 in Delight, a city in southwest Arkansas. He then attended UAF, where he earned his Bachelor of Arts degree in political science in 1973, and his law degree in 1979.

Scant evidence was introduced regarding to workforce statistics. The problem with the evidence that was introduced is that no statistical studies were done. As a general rule, to infer intention from statistical evidence, the expected value (the number of minorities expected to be in the work force) compared to the observed value (the number actually in the work force), requires a showing of two or more standard deviations.[61] Statistical studies resulting in two or more standard deviations are required to allow inferences of discrimination to be drawn from numerical workforce data. However, no statistical evidence was offered by Plaintiff, so no inference can be drawn.

There was troubling testimony from witnesses about racism in the higher ranks of UAF. A former member of the Board of Trustees (and former board chair), and a current board member admitted, during examination by Plaintiff's counsel, that they still use the word "nigger" and tell racial and ethnic jokes. Anyone "amongst the folks" knows that racial terms and jokes are still acceptable conversational coin with some people. It seems to me, however, that when a person accepts an important position of trust with the entire University of Arkansas system, he would purge his vocabulary of such words—and work on his heart and mind in the same vein.

Most troubling to me was that neither of these witnesses seemed abashed by their admissions. I hope I read them wrong on this point.

While this testimony was troubling, there is no reason to believe, based on anything in the record, that they had anything to do with the firing decision.

## VI. RACE AS A FACTOR IN RICHARDSON'S FIRING

In order to prove that his firing resulted from race discrimination, Plaintiff must first establish a *prima facie* case of disparate treatment. As pointed out earlier, that burden is not heavy.[62] In 1973, the Supreme Court first set fourth the elements of a *prima facie* case in *McDonnell Douglas Corporation. v. Green.*[63] This suggested method of analysis was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a "sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."[64]

As explained above, to establish a *prima facie* case, Plaintiff must only show that he is a member of a protected class, that he was performing his job at a level that met his employer's legitimate expectations and that he was fired even though he met his employer's legitimate expectations.[65] In this case, Plaintiff has met his burden of establishing a *prima facie* case.

At this point, the burden of producing evidence shifts to Defendants—they must articulate[66] a legitimate, nondiscriminatory reason for the firing.[67] At trial, Defen-

---

61. *Hazelwood School Dist. v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

62. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

63. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

64. *U.S. Postal Service Bd. of Govs. v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

65. *Calder v. TCI Cablevision,* 298 F.3d 723, 729 (8th Cir.2002).

66. I use "articulate" in this context only because all the appellate courts use it.

67. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

dants testified that there was only one reason for Plaintiff's discharge—a statement made on February 23, 2002, at a press conference following the Kentucky game. At that press conference, Richardson stated, without prompting, "If they go ahead and pay me my money, they can take the job tomorrow." This comment, coupled with similar comments he made in private on February 22, 2002, according to UAF's decision makers (Broyles, White, and Sugg), showed a lost interest and lack of commitment to UAF, undermined public confidence and support for the program, and had a negative impact on recruiting for all UAF sports. With these explanations, UAF has met its burden of articulating a legitimate reason for the termination.

 Because Defendants have articulated a legitimate non-discriminatory reason for terminating Plaintiff, the burden of production shifts to Plaintiff to establish pretext by a preponderance of the evidence. This means that Plaintiff is required to prove that Defendants' stated reasons are untrue, and that Plaintiff's race was the real reason for his firing.[68] A rejection of Defendants' stated reason for the firing as pretext will permit the trier of fact to infer intentional discrimination, and "no additional proof of discrimination is required."[69]

Here, I note parenthetically that Plaintiff earnestly submits that I should disregard, or nearly so, the testimony of White and Broyles. He argues that significant parts of their testimony and pre-trial statements lie on yon side of the truth line. As examples, with respect to Broyles, Plaintiff points out that, during the trial, Broyles testified as follows:

Q. Do you recall having previously indicated both in deposition and in here that in the year 2001 you had evaluated him and his work performance was satisfactory?

A: Mr. Walker—

Q: Do you recall that?

A: Yes.

Q: I see. Was that truthful?

A: It had to be done.

Q: Was it truthful?

A: No.

\* \* \* \* \* \*

Q: You said that. Did he have qualities in 2000, as of January 15, that you believed would make him a good athletic director?

A: I said that publicly.

Q: Yes. You said that publicly.

A: Yes.

Q: Was that intended to be a truthful statement?

A: It was to be a friendly statement.

Q: Was it truthful?

A: No.

With respect to White, Plaintiff points out that White testified that, without a doubt, the flatfooted decision to fire Coach Richardson (unless he would resign) was made on Sunday, February 24, 2002. Yet, on February 27, 2002, when asked by a reporter about a rumor that Richardson's contract would be bought out White as follows:

When I heard that on your program, I was there watching it and I said, "What! I can't believe this. Why don't I know about this?" And, uhh, Sugg called me and he said, "Did you know anything about this" and I said, "No, did you?" and he said, "No."

---

**68.** *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147–148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

**69.** *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 512 n. 4, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

No matter how you cut it, cube it, or slice it, the above statement to the Channel 7 reporter was not true. Still, the overwhelming weight of the testimony from other witnesses, as well as White, supports a finding that the decision was, in fact, made on Sunday, February 24, 2002.

Plaintiff's counsel may not realize it, but, with regard to these two witnesses, they are asking me to rely upon the old Latin maxim, "falsus in uno, falsus in omnibus" (false in one thing, false in everything).[70]

I need not, however, weigh this contention thoroughly because there were several other witnesses on this key point when I credit, (i.e., Dr. Sugg and the board members).

I believe it is also appropriate here to comment on Mike Nail's testimony for the Defendants. Most witnesses take the stand to tell the truth. One must, in my view, make reasonable allowances for conflicts of testimony which may well be clouded by the mists of time. Witnesses to an event *often* honestly hear and see things differently. Behavioral scientists have proved this (which we know from experience anyhow) beyond doubt. At the same time, the courtroom is the temple of justice and a judge should not let her or his tolerance for human frailty trump a frank view of a witness whose testimony clearly falls short of candor.

During closing argument, I pointed out that the testimony of Defendants' witness, Mike Nail, left gravel in my shoe. At the beginning of his testimony, he stated that he would rather be anywhere in the world than in the witness chair, since he considered Richardson to be his "good friend." He pointed out that he was appearing to testify under subpoena. I told counsel that I doubted the subpoena was effective, and that, more important, during the

course of his testimony, Nail's demeanor was not that of a person who did not want to testify.

After the trial, Defendant's counsel wrote a letter contending that the subpoena was effective. While he may be right, on previous occasions I have quashed subpoenas issued and served under almost identical circumstances. No other party has questioned the "100 mile" restriction in Rule 45 of the Federal Rules of Civil Procedure.

Be that as it may, I again point to Nail's demeanor. It appeared to me that he relished his role as clean-up batter for the Defendants, and he pretty much covered the waterfront for them. Despite my feeling on this, I probably would not have commented, but for another point which is important, in my view, in weighing his testimony.

Paul Eels, seatmate of Coach Broyles at the February 18, 2000, *Hawg's Illustrated* banquet, overheard Broyles' racial statement. He heard it as a direct statement, rather than as a quote; although he pointed out that he was not engaged in conversation with Coach Broyles when the racial remark was made. It may be that he missed an indication that it was a quote.

As indicated previously, I do not think that it makes any difference whether it was a direct statement or a quote, but everyone interested in the case knew that the distinction was very important to Coach Broyles. Nail testified that, in a private conversation prior to trial, Eels told him that it was a quote. This means that either Nail or Eels lied about this specific point. I am satisfied that Eels told the truth. I need not state the flip side of this opinion, except to say that, in

---

70. There is a jury instruction (rarely used nowadays) to this effect. *See* 3 K. O'MALLEY, J. GRENIG, & W. LEE, FEDERAL JURY PRACTICE AND INSTRUCTIONS, CIVIL § 105.04 (5th ed.2000).

finding for Defendants, I did not rely upon Nail's testimony.

In an effort to demonstrate pretext, Plaintiff compared the February 23, 2002, post-Kentucky game remark with a similar remark Richardson made in 1995 for which he was not terminated.[71] All of the defense witnesses testified that there was a great difference in the remarks. Quite frankly, I am not convinced. It could be argued that the 1995 remarks were worse. I am puzzled why no UAF administrator at any time talked to Plaintiff to express any discontent with his remarks.[72] According to the testimony of, Richardson's secretary, and Scott Cain, a news reporter, Richardson made this type of statement often.

Plaintiff's further evidence of pretext is that, on June 20, 2001, only eight months after Richardson signed his contract in 2000, Broyles recommended to White in a memorandum that Richardson's contract should not be rolled over because he wanted to limit all contracts to five years—the growing trend in intercollegiate athletics. In support of his recommendation, Broyles noted that Nutt's contract was not extended in January 2001.[73] However, Broyles failed to mention in his memo that he had recommended a ten-year contract for Nutt in October of 1999, which White approved.[74] This evidence is disturbing, but I cannot find it is pretext. When learning of the contract, Richardson advised Nutt to take it. Neither he nor Scanlon complained, Nor is there evidence that either Plaintiff or Scanlon tried to negotiate a ten-year contract. In any event, the disparity was correct with the refusal to roll-over Nutt's contract in 2000, 2001, 2002, or 2003. It appears from the evidence that the fact that the football program had seen four head coaches in six years was a motivating factor for the longer contract. Nutt's agent Sexton, testified that the ten year contract was given to signal stability for the purpose of recruiting.

Next, Plaintiff contends that pretext can be found because Broyles called the SEC to "dig up dirt" on Richardson. According to Plaintiff this call resulted in a letter from SEC Commissioner Kramer questioning Richardson's failure to join SEC media teleconferences. Three SEC officials testified that Richardson's allegations that Broyles had precipitated the letter had no basis in fact. Kramer testified that, either before or after writing the letter, he called Broyles to advise him the letter was being sent. He stated that this was routine. All three SEC officials, one of whom was African–American, denied having conversations with Broyles or anyone from the UAF before they acted. This testimony negates pretext.

Further, Plaintiff argues that the reasons given by Broyles for the firing are pretext for the real reason—race discrimination. This intention should be inferred, according to Plaintiff, from Broyles the fact that urged Henry to write an article comparing a "redneck SOB" to a "nigger." Thus, Broyles' stated reasons for firing Richardson for saying, "Fire me and pay me my money" is a pretext. They also argue that Broyles' statements are not worthy of belief. While I do believe the statements at the banquet would have required a direct evidence standard of review to any claims pre-October 2000, I do

---

**71.** Pl.'s Ex. 17.

**72.** I acknowledge that, when evaluating the evidence, a court is not authorized to sit as a super personnel department reviewing the wisdom or fairness of an employers business decisions. *Rose–Maston v. NME Hosps., Inc.,* 133 F.3d 1104 (8th Cir.1998).

**73.** Jt. Ex. 73.

**74.** Jt. Ex. 90.

not believe that they carry over for the reasons stated below.

Following the signing of the Richardson contract, Plaintiff wrote Broyles a letter suggesting they put the past behind them. Broyles immediately responded with a gracious note "burying the hatchet." Rick Schaeffer testified that, after the contract was signed, Broyles expressed his belief that the matter was resolved and both men appeared to be happy. There is substantial evidence that demonstrates that the problems between Broyles and Richardson had been resolved.[75] Richardson's secretary stated that after the contract was signed, Richardson seemed happy. Significantly, Scanlon also testified that he believed any previous problems had been resolved.

Plaintiff also argues that the timing of White's decision to fire Richardson supports a finding of pretext. I think it is clear that Broyles recommended the decision. I find it unlikely that White would make a decision to fire a head coach without Broyles' blessing. I also note that Richardson's contract required that White make the decision. I find it immaterial whether White made the decision before or after he met with Broyles—White made it.

Defendants presented additional evidence to rebut a finding of pretext through the testimony of Doug Dickey, the former Athletic Director at the University of Tennessee. His testimony was impressive and convincing. Dickey testified that there are requirements in order for a coach to continue an employment relationship with an institution. The team must be competitive and the coach must supervise his players' academic progress and their discipline. I was most struck with Dickey's testimony that there needs to be a public aura around the program that says we have a "contentment within the family of the University." Dickey went on to say that an athletic department is in the marketing business and the entertainment business. The public buys the tickets and priority seating, watches the teams on television or listens on the radio, and attends club meetings throughout the state. A coach must "be a player on the team" and be a positive influence a university.

Dickey cited as an example basketball coach Jerry Green who, when his team faltered, became irritated and stated publicly, "If they want somebody else to do this job, just pay me off." Dickey took him up on it.

Sugg is the only one of the three decision makers (Sugg, White, and Broyles) who saw the post-Kentucky game interview. He testified that he was distressed at the remarks, and thought them to be an embarrassment to the University, the fans, and the athletic program. There has been no suggestion that Sugg had any racial motive. In fact, Plaintiff testified that he had a great deal of respect for Sugg. I cannot find that Sugg was motivated in any way by race in his decision to approve the firing. In fact, I credit his testimony in its entirety on these crucial points. Thus, in my view, this is the clincher for Defendants' articulated reason for the firing.

Each of the individual parties obviously is shot-through with what Martin Luther King, Jr., in one of his great speeches, called the "drum major instinct." Each has what John Adams called "the passion for distinction." They are achievers. I do not make this observation in a critical sense. To the contrary, as Dr. King pointed out, the drum major instinct, if channeled in the right direction, is a good thing. I have long admired—from a distance—each of the individual parties.

---

75. Jt. Exs. 8, 10, 11, 12, 64, and 85; Schaeffer's testimony.

They have accomplished much in their own spheres.

I believe it is meet and proper to make a special comment regarding the achievements of Plaintiff. I cannot know with certainty the difficulty that a minority person experiences when she or he is born with that extra portion of the drum major instinct—with that drive to "be somebody" or to excel. Anyone who knows anything about the ways of the world knows that these persons carry a heavy weight in their journey toward the finish line. I wish it weren't true, but it is. Because of this fact, and because of his age (62), I credit Richardson's testimony that it has been, and will be, extra hard for him to resurface in the coaching ranks at or near the level he left at UAF.

In weighing all of the evidence it seems clear to me that Richardson should have been counseled about his sometimes intemperate remarks, and that UAF administrators should have made more timely and direct responses to his complaints. No one can say for sure, but I am inclined to believe that the firing could have been avoided, or postponed considerably, if there had been more and better communication by his supervisors.

I hasten to point out, however, that my resumé reflects no experience as an AD, Chancellor, or President of a university. As long as the firing did not violate constitutional or statutory standards, the matter is to be filed under the UAF's business, not that of a federal judge. An Eighth Circuit Jury Instruction given in Title VII cases puts it succinctly:

> You many not return a verdict for plaintiff just because you might disagree with defendants' decision or believe it to be harsh or unreasonable.[76]

When, as here, I sit as a jury, I am bound by the law in this instruction.

I believe that the standards of conduct set out by Coach Dickey are reasonable, and, more importantly, I believe that his standards are within the "leadership" requirements in Plaintiff's employment agreement.[77]

In fine, everything considered, I cannot find, by a preponderance of the evidence, that Plaintiff's firing was because of his race.

## VII. UAF'S ALLEGED FIRING OF RICHARDSON IN RETALIATION FOR THE EXERCISE OF HIS FIRST AMENDMENT RIGHTS

 The United States Supreme Court has repeatedly held that a government may not place "unconstitutional conditions," on a public employee's exercise of free speech under the First Amendment. Courts generally use a three-step analysis when evaluating First Amendment retaliation claims. First, to prove a violation of her or his First Amendment rights, a public employee must demonstrate that the speech in which he is engaged is protected speech. To establish this, he must show that the speech can be "fairly characterized as constituting a matter of public concern," and not a matter of private interest.[78] Speech is a "matter of public interest or concern" when it touches upon "any matter of political, social or other concern to the community."[79] Opposition to racial discrimi-

---

**76.** 8th Cir. Civ. Jury Instr. 5.54 (2001).

**77.** Jt. Ex. 5.

**78.** *Sparr v. Ward*, 306 F.3d 589, 594 (8th Cir.2002) (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

**79.** *Connick*, 461 U.S. at 146, 103 S.Ct. 1684.

nation *is* a "matter of inherently public concern." [80]

If Richardson is able to demonstrate that the speech he engaged in is a matter of public concern, a balance must be struck between the "interests of the employee, as a citizen, in commenting upon matters of public concern" and, the interest of the State, as an employer. in promoting the efficiency of the public services it performs through its employees." [81] This balancing test is commonly called the "Pickering Test."

If a court determines that the speech is protected, Plaintiff must prove that the protected speech was a "substantial or motivating" factor in the employer's decision to fire him. [82] If, and only if, Plaintiff makes this showing, the burden of proof shifts to the defendant, and the employer can prevail only if it can show that it would have made the same decision regardless of the protected speech. Only then can the employer prevail.

To determine whether speech touches on a matter of public concern, the court must examine the content, form and context of the speech, given the record as a whole. This inquiry is a question of law for the court to decide, even in cases in which there is a jury trial. [83] Specifically, the court must "determine whether the purpose of the speech was to raise issues of public concern or to further the employees own private interests." [84] The Supreme Court has cautioned that it is only when a public employee speaks as a citizen on matters of public concern that the speech is entitled to protection. The fact that the issue could be interesting to the community does not make it an issue of public concern. [85]

It is true that during his tenure of seventeen years as head coach of the Arkansas Razorback basketball team, Richardson spoke out on matters of public concern, specifically on matters of race. [86] It is also true that Richardson just spoke out, period. On more than one occasion, Richardson used language that had traditionally been reserved for the locker room. For some, this language was a problem. However, if brought to Richardson's attention, he always apologized to the fans. For some, those with crusty souls, the language was colorful, refreshing, and perceived as just an extension of the locker room to the livingroom. In any event, Richardson's media statements created interest.

There was much ado about Richardson's 1995 "turds and assholes" comment. Former Chancellor Dan Ferritor testified about his serious disapproval of the comment, yet he was quick to admit that he never talked to Richardson about his concern, nor did he direct Broyles to do so. As previously mentioned, the "redneck SOB's" incident and the stir that it caused was never discussed with Richardson. At no time was he counseled regarding his public comments.

Similarly, on numerous occasions, Richardson had made remarks such as, "If they don't like my work they can pay me my money and I'll be on my way." This was the testimony of his secretary Terry Mer-

**80.** *Id.* at 148, 103 S.Ct. 1684.

**81.** *Pickering v. Bd. of Educ. of Tp. High Sch. Dist.,* 301 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

**82.** *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 286, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

**83.** *Connick,* 461 U.S. at 159, 103 S.Ct. 1684.

**84.** *Sparr,* 306 F.3d at 594.

**85.** *Colburn v. Trustees of Ind. Univ.,* 973 F.2d 581, 586 (7th Cir.1992).

**86.** Pl.'s Exs. 2, 74; Jt. Exs. 34, 42, 44.

cer and of Fred Vorsanger, manager of Bud Walton Arena. A similar remark appeared in a newspaper article in 1995.[87] Yet it is Richardson's almost identical comment, made on February 23, 2002, that is given by Defendants as the *only* reason for his firing.

I have already ruled that the October of 2000 contract released all claims for constitutional violations before that date. Thus, the only speech that must be examined, is what Richardson said after that date. Defendants' stated reason for terminating Plaintiff was for speech made at a press conference after the Kentucky game on February 23, 2002. In that press conference, Richardson stated:

> "If they go ahead and pay me my money, they can take the job tomorrow." [88] "But you know, once again, that's me. And I'm glad I'm who I am. I'm glad I don't have to answer to really anyone, but myself and my God upstairs. That's the only people I answer to, for real. I'll answer to the chancellor and the AD's [athletic directors], and things of that nature, but fans and things of that nature, I don't answer to those people".[89]

These statement became the buzz of the media.

After examining the content, form, and context of the speech, as I am required to do, I find that the Plaintiff's statements in the February 23, 2002, press conference do not constitute protected speech. The Eighth Circuit clearly held that "when a public employee's speech is purely job-related, the speech will not be deemed a matter of public concern." [90]

On cross examination, Plaintiff was asked to identify everything that he considered to be a violation of his free speech rights between October 12, 2002, and the date of his official termination on March 1, 2002. In response, he cited three instances: (1) the Monday, February 25, 2002, press conference; (2) Richardson's comments regarding the "blue-light sale" on Tuesday, February 12, 2002; [91] and (3) "some things that overlap between discrimination and freedom of speech."

In responding to question about recruiting, Richardson was quoted in a newspaper article as saying:

> Coaches say, "If you want to go to Arkansas, are you going to the blue-light sale on Saturdays and Sundays?" Richardson said, "They ain't got nothing to do there but play basketball. You've got to have a social life." [92]

Richardson went on to say in the same article that, with another NCAA investigation probing Arkansas athletics, he was glad his recruits already had signed national letters of intent.[93]

It is true that these statements upset Coach Nutt and that he let Coach Broyles know about it. Broyles then sent the memorandum to White referring to Richardson's "blue light special" and Nutt's discomfort with it.[94] It is also true that Fayetteville, Arkansas, does not have a significant number of African–Americans. Likewise, there are no black colleges or metropolitan areas nearby. This creates a challenge for recruiting African–American basketball and football players, something that was confirmed by the testimony of

**87.** Pl's. Ex. 17.

**88.** Defs.' 55, 56, 57.

**89.** Defs.' Exs. 55, 56.

**90.** *Sparr,* 306 F.3d at 594.

**91.** Jt. Ex. 52.

**92.** *Id.*

**93.** *Id.*

**94.** *Id.*

both Eddie Sutton, former Arkansas basketball coach, and Dickey. However, I do not consider Richardson's statements as an attempt to raise the social consciousness of the public, or to challenge the UAF for anything that it had either done or not done regarding the issue of race as it relates to student athletes. While I can sympathize with the challenge Fayetteville's location may well place on recruiting, the words do not in any way seem to be said in the tone of a citizen concerned about racial inequities. I just cannot find that the words are "matters of public concern." And there is no direct evidence that the words were even considered in the decision to terminate Richardson.

Finally, there is the issue of Richardson's speech regarding his differences with UAF's position on graduation rates. In January 2002, White and Richardson were interviewed for a segment on ESPN which focused on the 1994 championship team and the basketball program's low graduation rates as compared with those of Duke. During the interview, Richardson stated that he had a limited ability to affect graduation rates in his program and that the ultimate responsibility lay with the student athlete. There is no evidence that, before this interview, anyone at the UAF had in any way tried to put any restraints on him. In fact, Richardson admitted in his testimony that no one at UAF ever told him that he could not speak out on any matter. Furthermore, the ESPN program did not air until March 1, 2002, and no one had seen the interview at the time of the decision to fire Richardson. There is insufficient evidence to support Richardson's claim that his firing was linked to his speech during the ESPN interview.

Plaintiff argues that it is not only this press conference but the press conference on February 25, 2002, that must be examined because it also formed the basis of the termination. Because I have made a fact finding that the firing decision occurred on February 24, 2002, I need not consider any speech which occurred after that date.

I find that Plaintiff has failed to meet his burden of establishing a *prima facie* case of First Amendment retaliation with respect to any defendant.

## VIII. CONCLUSION:

There are three observations that I feel compelled to make before closing this decision:

1. I am satisfied beyond per adventure that Coach Richardson believes, without any doubt in his mind, that he was fired because of his race, and because he spoke out on that subject. Although I have found against him on those points, his belief was clearly not unreasonable. In other words, while I do not believe the evidence of racial bias or impingement of free speech preponderates in favor of Plaintiff, the record is a long way from devoid of incidents which could cause him to hold these beliefs.

2. This lawsuit is *not* about money in the pejorative sense. It is primarily about wounded pride—wounded pride in a man who started way behind but climbed to the top by hard work, savvy, and most of all, perseverance. Many of us greatly admire, or claim to admire, these traits. This case is no more "all about money" than is the lawsuit of a person who has been maimed by a drunken driver. I reject this suggestion out-of-hand.

3. As I expressed at some point during the trial, I do not accept the notion that someone who draws a good salary, and who thinks he has been wrongfully fired, should "take his contract money and run." A high achiever who earns a high wage is just as entitled to the protections afforded him by our Constitution and statutes as is the middle- or low-income person. The

Constitution is "collar" blind as well as color blind.

In closing I want to once again express my appreciation for the professional, vigorous job done by the lawyers to protect the interests of their respective clients.

Plaintiff's Complaint should be, and hereby is DISMISSED WITH PREJUDICE. Each party will bear its own expenses, including attorneys' fees.