# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1862

_____

David R. Horn,      *
                               *

          Appellant,      *

                               *      Appeal from the United States

      v.                           *      District Court for the

                               *      District of Minnesota.

University of Minnesota,      *

                               *      [PUBLISHED]

          Appellee.      *

_____

Submitted: February 11, 2004
Filed: April 6, 2004

_____

Before MORRIS SHEPPARD ARNOLD, HANSEN, and RILEY, Circuit Judges.

_____

HANSEN, Circuit Judge.

David Horn, a former assistant coach of the University of Minnesota women's hockey team, appeals from the district court's[1] grant of summary judgment in favor of the University of Minnesota on Horn's claims of wage discrimination, retaliation, and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2000e-17 (2000), and the Equal Pay Act, 29 U.S.C. § 206(d)

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

(2000). Horn alleged that the University paid him less than a similarly situated female assistant coach, retaliated against him for complaining about the wage disparity, and constructively discharged him. The district court concluded that the two assistant coaches did not hold substantially equal positions, that Horn was not subject to an adverse employment action, and that Horn's working conditions were not intolerable. For the reasons discussed below, we affirm the judgment of the district court.

## I. Background

In preparation for the 1997-98 inaugural season of the women's hockey team, the University hired a head coach, Laura Halldorson, and created two assistant coach positions. Elizabeth Witchger was appointed to an 11-month term at a salary of $33,000 ($3,000/month).[2] Horn was appointed to a 10-month term at a salary of $20,000 ($2,000/month). Although Halldorson categorized Witchger as the "First Assistant" and Horn as the "Second Assistant," the University posted only one description of the "Assistant Women's Ice Hockey Coach" position (Appellant's App. at 1), and the job title and description in both coaches' contracts were identical except for the salary and the term. (Id. at 23, 25.) Nevertheless, Horn admits that he was aware that he was accepting the position of "Second Assistant."

As contemplated by their contracts, both assistant coaches shared a number of basic duties organizing daily practices and developing game plans. Additionally, Halldorson provided Witchger and Horn with itemized lists of separate, individual job duties. (See id. at 27, 30, 33.) Specifically, Witchger served as the external liaison with "SID, public relations, promotions, and community outreach." (Id. at 30.)

---

[2]Although Witchger's initial contract set her appointment term at 11 months (July 29, 1997 to June 30, 1998), her $33,000 salary was based on a 12-month term. (Appellant's App. at 25.) Viewing the facts in the light most favorable to Horn, we will assume that Witchger was paid $33,000 for her 11-month appointment.

Halldorson directed Witchger to start and maintain a booster club, represent the team at meetings in Halldorson's absence, organize all team travel and arrange meals and transportation for home games, and create a database to monitor information about potential recruits. In contrast, Horn served as the internal liaison with the athletic trainer, strength and conditioning staff, academic counselor, and equipment manager. He had the additional responsibilities of identifying and evaluating potential recruits and breaking down the videotape of games.

At the end of the 1997-98 season, both assistant coaches received favorable reviews, contract renewals, and salary increases. At some point during the season, Horn discovered the original and ongoing difference between his salary and that of Witchger and complained to the Director of Women's Athletics. Horn alleges that after he made his initial complaint, Halldorson began to treat him poorly, failed to communicate effectively with him, and undermined his authority in front of players. Halldorson also gave Horn a poor performance evaluation for the 1998-99 season and recommended that his contract not be renewed. Additionally, Halldorson failed to invite Horn to participate in her independently run summer 1999 hockey camp. Nevertheless, after the 1998-99 season, the University offered Horn a new 12-month contract with another salary increase. Horn rejected the offer and left the University for another employer in the fall of 1999.

## II. Discussion

"We review the district court's grant of summary judgment de novo." Tademe v. Saint Cloud State Univ., 328 F.3d 982, 986 (8th Cir. 2003). "We apply the same standard as the district court and determine whether the record shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." Id. at 986-87 (internal marks omitted); Fed. R. Civ. P. 56(c). We must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. Tademe, 328 F.3d at 987. Nevertheless, the nonmoving

party bears the burden of clearly identifying disputed material facts that would allow a reasonable jury to return a verdict in favor of the nonmoving party. Id. Contrary to Horn's assertion, nothing in our caselaw suggests that the EEOC's probable cause determination itself relieves a claimant of this burden. Cf. Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988) ("[T]he Commission's findings are not sufficiently probative to create a genuine issue of material fact about [the defendant's] intent to discriminate. . . . The Commission's report merely repeats facts which [the plaintiff] himself alleged elsewhere in this case, and then states in conclusory fashion that those facts reflect . . . discrimination. Such findings, standing alone, are not enough to salvage [the plaintiff's] claim.").

## A. Wage Discrimination

To establish a prima facie case under the Equal Pay Act, Horn must show that the University discriminated on the basis of sex by paying different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). In this context, we also analyze a Title VII wage discrimination claim based on unequal pay for equal work under the Equal Pay Act framework. See Tenkku v. Normandy Bank, 348 F.3d 737, 741 (8th Cir. 2003).

It is undisputed that Horn was paid less than Witchger. Thus, Horn must come forward with evidence that the two assistant coaching positions were "substantially equal" in order to survive summary judgment. See Lawrence v. CNF Transp., Inc., 340 F.3d 486, 491-92 (8th Cir. 2003) (internal marks omitted).

> Whether two jobs are substantially equal requires a practical judgment on the basis of all the facts and circumstances of a particular case, including factors such as level of experience, training, education, ability, effort, and responsibility. Application of the Equal Pay Act depends not

4

on job titles or classifications but on the actual requirements and performance of the job. In all cases, therefore, a court must compare the jobs in question in light of the full factual situation and the broad remedial purpose of the statute.

Id. at 492 (internal citations and marks omitted). While it is clear that Horn and Witchger did not have identical duties, Horn argues that he and Witchger shared a number of basic coaching duties, as well as a number of separate duties that required equal amounts of skill, effort, and responsibility.

Although Witchger and Horn may have expended equal amounts of time and effort in fulfilling the duties of their respective positions (see Appellant's App. at 27), Witchger's recruiting and public relations duties required skills and experience that were distinct from those required by Horn's duties. In describing her decision to name Witchger as the "First Assistant," Halldorson noted that Witchger's ability to communicate with the public and her experience as a highly-recruited player in a Division I program gave her an edge in making recruiting contacts, coordinating a booster club, and appearing in place of Halldorson at public speaking events. Horn also admits that Witchger initially performed many of the duties now held by an administrative assistant. These scheduling and planning duties placed a unique degree of responsibility on Witchger. Initially, Halldorson was equally complementary of Horn's abilities to identify potential recruits, break down game tape, and coordinate with other University staff such as the trainers, equipment managers, and academic counselor. Nevertheless, these abilities, skills, and responsibilities differed significantly from those of Witchger.

Essentially, Witchger's additional duties required her to serve as a public representative of the hockey team as well as its administrative assistant, while Horn's additional duties involved much more "behind the scenes" work. Because the two positions required different types and degrees of skill and responsibility, they were not "substantially equal" as required by the Equal Pay Act and Title VII. We will not

5

engage in a subjective assessment of the University's decision to value the duties of the "First Assistant" over those of the "Second Assistant" where the duties themselves were different.

## B. Retaliation

Horn alleges that the University and Coach Halldorson unlawfully retaliated against him for filing a wage discrimination complaint with the Women's Athletic Director. Title VII prohibits an employer from taking any adverse employment action against an employee who "has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a). The parties agree that Horn engaged in a protected activity under Title VII. Thus, in order to survive summary judgment, Horn must show that he suffered an adverse employment action on account of his participation in the protected activity. See Buettner v. Arch Coal Sales Co., 216 F.3d 707, 713-14 (8th Cir. 2000), cert. denied, 531 U.S. 1077 (2001).

"Employment actions which do not result in changes in pay, benefits, seniority, or responsibility are insufficient to sustain a retaliation claim." Id. at 715. Halldorson's failure to invite Horn to participate in her independently run hockey camp was unrelated to the terms or conditions of Horn's employment. Furthermore, Halldorson's ongoing documentation of Horn's alleged performance problems did not adversely affect Horn's employment status with the University. Horn's working conditions may have become somewhat uncomfortable after he filed his complaint, but Horn fails to offer any evidence that the deterioration of his working relationship with Coach Halldorson resulted in any materially significant disadvantage to Horn. Indeed, Horn not only retained his job with the University, he received an offer for an extended contract term of 12 months at an increased salary.

6

## C. Constructive Discharge

Finally, Horn asserts that the University and Coach Halldorson created such intolerable working conditions that he was forced to quit his job and seek employment with another institution. "An employee is constructively discharged when an employer deliberately renders the employee's working conditions intolerable and thus forces [the employee] to quit [his] job." West v. Marion Merrell Dow, Inc., 54 F.3d 493, 497 (8th Cir. 1995) (internal marks omitted). Even if Halldorson wanted Horn to quit and took steps to prevent him from being rehired for the 1999-2000 year, her actions do not rise to the level of a constructive discharge unless her actions created "intolerable" working conditions for Horn.

Horn argues that Halldorson's documentation of his alleged performance problems and her unprofessional treatment of him in the presence of players forced him to quit. While we agree that these conditions may have been uncomfortable or difficult for Horn, they did not rise to the level of "intolerable working conditions" as defined under Title VII. Cf. Duncan v. Gen. Motors Corp., 300 F.3d 928, 935-36 (8th Cir. 2002) (holding that offensive and disrespectful working conditions were not so intolerable as to cause a reasonable person to resign), cert. denied, 123 S. Ct. 1789 (2003); Jones v. Fitzgerald, 285 F.3d 705, 716 (8th Cir. 2002) ("Constructive discharge requires considerably more proof than an unpleasant and unprofessional environment."); Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1160 (8th Cir. 1999) ("The working atmosphere was not ideal, but 'a feeling of being unfairly criticized or [having to endure] difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.'") (internal marks omitted) (alteration in original); Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 496 (8th Cir. 1996) (noting that mere dissatisfaction with working conditions does not establish a constructive discharge).

Accordingly, we affirm the judgment of the district court.

_____