Hammond v. Berlin City's Vermont Remarketed Autos, Inc., No. S1316-02 CnC
(Norton, J., Mar. 10, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the
original. The accuracy of the text and the accompanying data included in the Vermont trial court
opinion database is not guaranteed.]

STATE OF VERMONT                                                    SUPERIOR COURT
Chittenden County, ss.:                                        Docket No. S1316-02 CnC


LOUISE HAMMOND

v.

BERLIN CITY'S VERMONT
REMARKETED AUTOS, INC., d/b/a
BERLIN CITY CENTER and d/b/a BERLIN
CITY'S KIA OF BURLINGTON


ENTRY

This is a case about employment discrimination. The plaintiff, Louise Hammond,
claims that the defendant, Berlin City's Vermont Remarketed Autos, Inc., violated the
Vermont Fair Employment Practices Act, 21 V.S.A. § 495, through discriminatory
wages, sexual harassment, and retaliation. Hammond also claims Berlin City violated the
federal Equal Pay Act, 29 U.S.C. § 206(d) (2000), through discriminatory wages.[1] Berlin
City moves for summary judgment on all claims.

Summary judgment is appropriate where there are no genuine issues of fact and a
party is entitled to judgment as a matter of law. V.R.C.P. 56(c)(3). The court views the
facts in a light most favorable to the non-moving party, granting the party "the benefit of

all reasonable doubts and inferences [and regarding] all properly supported allegations presented by the opposing party as true." Hodgdon v. Mt. Mansfield Co., 160 Vt. 150, 159 (1992). Accordingly, the court makes the following findings for the purposes of summary judgment.

Hammond worked as a Guest Services Manager at Berlin City, a car dealership, from June 1997 through September 20, 2002. This position was the lowest paid of a number of managerial positions at Berlin City. Hammond's position called for managing a staff of six guest services employees, which included hiring, training, supervising, and scheduling. The Guest Services Department typically handled the dealership's initial contact with incoming customers, including greeting the customers, giving a facility tour, and introducing Berlin City's automobile warranty plan. She would occasionally intervene in incidents with dissatisfied customers. Her position therefore required customer relations and communications skills. Hammond also performed scheduling duties for 22 Berlin City drivers who transported vehicles among various dealership locations and served as an event planner, making arrangements for special events.

Hammond's position bore some similarities with the sales manager and general sales manager positions. Sales managers oversaw a few sales guides, whom they assisted in interacting with customers and making sales deals. The sales manager therefore needed customer relations, communications, and managerial skills. The general sales manager oversaw the sales managers, and also required similar skills.

Hammond's position also bore some similarities with the finance managers, who were responsible for meeting with customers after the sales team made a sale that was subject to financing. Finance managers would determine the financing for which a customer would qualify. Thus, finance managers needed customer relations and communications skills. Finance managers did not oversee a staff, though.

---

[1] Hammond's complaint also included claims for a violation of the Federal Communications Privacy Act, 18 U.S.C. §§ 2510–2522 (2000), invasion of privacy, and negligent supervision. The court dismissed these three claims in an order dated March 18, 2003.

Berlin City alleges that sales managers required sales experience and finance managers required finance experience, but Hammond alleges that employees in both positions could gain all knowledge necessary to perform their jobs through on-the-job training. Managers were frequently transferred to and from sales manager positions and finance manager positions with little difficulty. Hammond alleges that upper managers at Berlin City told her she could easily become a finance manager with only brief training.

Both finance managers and sales managers worked out of the same facility in which Hammond worked, with similar work stations and the same general surroundings. All of these positions required similar mental exertion, in terms of meeting deadlines and organizing one's time.

The general sales and finance managers also reported to Berlin City's general manager (the sales managers reported to the general sales manager). They all also attended management meetings together.

Other positions included the general manager, who oversaw the overall operation at the dealership; the office manager, who was required to have accounting experience, managerial skills and experience, and leadership and computer skills; the parts manager, who was required to have automotive parts/inventory experience, computer experience, and managerial skills; the sales manager/buyer, who was required to have experience in the automotive industry, sales experience, automotive appraisal experience, and communication skills; and the service manager, who was required to have customer relations skills, managerial skills, automotive service and repair experience, and computer skills.

Chief Operating Officer Steve Roach told Hammond once that her position was as important as the general manager and service manager positions. Roach and other managers told Hammond several times that her department was of comparable importance to the sales or finance departments.

In August 2000, Hammond met and began dating Ronald McFarland, who then began working as a Service Manager at Berlin City. Hammond terminated their relationship on March 8, 2001. McFarland sought to resume their former relationship for a number of months thereafter. Hammond made it clear to him that she was not interested.

3

Around July 2001, McFarland began to call Hammond both at work and at home, with as many as 15 calls a day. McFarland would tell her that he missed her and he wanted to be with her. He would also stop by her work station to talk to her about their relationship. Being a service manager, McFarland had no legitimate business reason to be near Hammond's work area. The two still played tennis together occasionally and went out to dinner once in August 2001, but Hammond made it clear to him that she did not want to resume the relationship.

When they went out to dinner in August, McFarland told Hammond that he had been accessing her personal e-mail account and reading her messages while he was at work. This upset Hammond, and she soon after met with Berlin City Sales Manager Robert Swartout, a designated sexual harassment reporting representative under Berlin City's sexual harassment policy. Hammond informed him of her relationship with McFarland and of her concerns with his recent behavior, including the e-mail interceptions. She told Swartout, however, that she did not want management to take any action but only wanted Berlin City to be aware of the situation in case it became a bigger problem.

Over the next month, McFarland continued to call Hammond at work, and Hammond believed he had been taking roses and mementoes from her desk. Hammond had received these items from a new boyfriend. She spoke with Swartout on two occasions. She had tried to handle McFarland on her own but decided that she needed management to intervene. Swartout spoke with McFarland, and McFarland's behavior got worse. After Swartout first addressed the issue with McFarland, he approached Hammond and stated that he could not believe Hammond had spoken to Swartout about his behavior. He also stated, "Don't fuck with me or I'm going to make your life miserable." Hammond reported this to Swartout a couple days later. McFarland continued to call Hammond at work, making kissing noises into the phone. Hammond believes that Swartout spoke to McFarland a second time, and the situation improved slightly.

On September 17, 2001, however, Hammond found McFarland at a printer at work waiting to print out an image of Hammond's new boyfriend. Hammond had e-mailed this image to her personal e-mail account and believed that McFarland had intercepted the e-mail. Hammond reported this incident to Swartout and told him to take

4

action. Hammond made it clear that she wanted Berlin City to intervene. Swartout issued a stern warning to McFarland to stop his behavior.

On September 19, Hammond found a Post-it note on her computer, stating: "Happy Birthday Louise. I want to know what happened to those times when we went swimming naked and made love on Carter's boat?" The note referred to an incident during Hammond's relationship with McFarland. Hammond reported the note to Swartout, who said he would speak to McFarland.

On September 21, Hammond was on vacation in Florida and learned from her roommate in Vermont that McFarland had called her home 18 times in one day (several times from work), leaving her three voicemail messages. McFarland's messages were something to the effect of him missing her and wanting to be with her. Hammond reported this behavior to Swartout from Florida and told him to tell McFarland to stop bothering her.

There were a number of incidents after September 21 when McFarland continued to call Hammond at her work station. Hammond told Swartout on October 8 that McFarland's behavior had not stopped: he continued to call her and read her e-mails. Around this time, Swartout contacted Roach and reported that Hammond wanted Berlin City to investigate the situation. Roach conducted an investigation and issued a written warning to McFarland, threatening termination if incidents continued. Most of the warning addressed work performance issues, such as McFarland spending more time at the service counter and less time at his computer. Hammond was dissatisfied with Berlin City's actions, noting that she did not understand why management had not taken action earlier.

Even after this warning, including on October 11, McFarland continued to call Hammond's work station, and she continued to report these calls to Swartout. McFarland would also make howling noises in the showroom directed at Hammond and he asked her to attend the company's Christmas party with him. McFarland also stopped by Hammond's house, and she also reported this to Swartout. Things did gradually improve by 2002, however.

Hammond also alleged that throughout these incidents, Swartout would often appear disinterested, rolling his eyes at her reports. Swartout also would not ask any questions to elicit further information and, on a couple of occasions, would abruptly end

the conversation. Berlin City's sexual harassment policy provides that upon a report to a sexual harassment representative, "[t]he matter will be thoroughly investigated, and appropriate, disciplinary action will be taken."

In mid-November, Roach became aware of certain managers, including Hammond, taking half-day vacations. Roach imposed stricter scheduling and vacation requirements on all Berlin City managers. He spoke to Hammond specifically about her vacation practices. Hammond had frequently worked four-day weeks, which Roach no longer wished to permit. At this time, he also denied Hammond's six-week unpaid leave, which was to begin in January. Hammond had requested this leave in July 2001 and the office manager had orally granted her permission to take it. Hammond, a single mother, needed the leave to care for her son, because her son's child care provider was unavailable. Hammond had to make last-minute arrangements for child care.

In mid-2002, the general manager for the dealership wrote up an employee warning for Hammond while she was on vacation. Hammond complained about this warning, and the general manager acknowledged that he had issued it erroneously. He withdrew the warning immediately.

Before she left Berlin City, Hammond also received increased scrutiny from Roach, including scrutiny over her scheduling, her lack of lunch breaks, and her use of a particular parking spot. Hammond left Berlin City on September 20, 2002, and filed this complaint shortly thereafter.

The court first addresses the Equal Pay Act claims. The federal Equal Pay Act provides that

> [n]o employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1). To establish a claim under the Act, a plaintiff must show that her job is "substantially equal" higher-paid jobs held by members of the opposite sex. Tomka

6

v. Seilor Corp., 66 F.3d 1295, 1310 (2d Cir. 1995). "[J]obs which are 'merely comparable' are insufficient to satisfy a plaintiff's prima facie burden." Id. (quoting Lambert v. Genesee Hosp., 10 F.3d 46, 56 (2d Cir. 1993)). The jobs must have equal "skill, effort, and responsibility," as well as "similar working conditions." The court is guided by standards promulgated in Equal Employment Opportunity Commission regulations, 29 C.F.R. §§ 1620.13–1620.18 (2004), in defining and applying these terms. See Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 449 (D.C. Cir. 1976) (holding that administrative interpretations of Equal Pay Act are entitled to "great deference" in applying Act). The court's "inquiry focuses on the primary duties of each job. Equal jobs must have a common core of tasks." Ballard v. Univ. of Vt., 166 Vt. 612, 614 (1997) (mem.) (citations omitted).

Once a plaintiff meets the initial burden of demonstrating that workers of the opposite sex had positions that were substantially equal and received higher compensation, the burden shifts to the defendant to demonstrate that any of the four exceptions apply. Tomka, 66 F.3d at 1310. "An employer who attempts to justify a pay differential based on a 'factor other than sex' must also prove that the gender-neutral factor was adopted for a legitimate business reason." Id.

Berlin City argues that Hammond has failed to demonstrate that the skill, effort, responsibility, and working conditions involved with her guest services position were equal to any of the other positions that she alleges had higher pay scales. Hammond argues that at least three positions—the general sales manager, the sales manager, and finance manager—required substantially equal skill, effort, and responsibility, and the work took place in similar working conditions.

The court agrees that Hammond has met her burden to defeat summary judgment with respect to the Equal Pay Act claims related to the general sales manager, sales manager, and finance manager positions. First, the court notes that "[a]pplication of the equal pay standard is not dependent on job classification or titles but depends rather on actual job requirements and performance." 29 C.F.R. § 1620.13(e). Moreover,

> [w]hat constitutes equal skill, equal effort, or equal responsibility cannot be precisely defined. In interpreting these key terms of the statute, the broad remedial purpose of the law must be taken into consideration. . . . It should be kept in mind that "equal" does not mean "identical." Insubstantial or minor differences in the degree or amount of skill, or effort, or

7

> responsibility required for the performance of jobs will not render the equal pay standard inapplicable.

Id. § 1620.14(a).

Turning to the skills required for these positions, all jobs overlap in that they generally require customer relations and communications skills. Hammond's job entails the primary interaction with customers, where she and her staff greet them and give them a tour of the facility, answering any initial questions they might have. Sales managers then handle customers as they consider a purchase and ultimately close a deal. And finance managers handle loan options for customers who need to finance a purchase after deciding on a particular vehicle. Although these positions may require different types of skills in customer relations, Hammond has provided enough information for a rational trier of fact to determine that the "amount or degree" of skill is the same. See id. § 1620.15(a). Berlin City characterizes Hammond's Guest Services position and the finance and sales positions as apples and oranges, but it provides no specific facts to suggest that the customer relations skills needed in Hammond's job were different in degree or amount from those skills need to complete a sale or secure a loan.

The positions also overlapped somewhat in the supervisory skills needed. Although finance managers did not oversee a staff, the sales managers oversaw sales guides and the general sales manager oversaw the sales managers. Guest Services and Sales positions both dealt with hiring and training staff members.

Skill also includes experience "measured in terms of the performance requirements of the job." Id. Berlin City alleges that sales managers required sales experience and finance managers required finance experience, but it does not explain how this experience is necessary for the jobs themselves. Hammond stated that her managers at Berlin City had told her she could easily become a finance manager, even though she did not have finance experience. If "experience" is merely brief, on-the-job training about how financing works, for example, it represents an insignificant difference in the skills required in both positions. The common core of skills relevant to all of these positions according to Hammond's allegations is customer relations and communications.

Turning to effort, Hammond has provided enough facts to demonstrate that her job required substantially equal "mental exertion" as the sales and finance jobs. See id. § 1620.16(a). Although the stresses of handling initial customer relations may differ from

8

those related to closing a sale or securing adequate financing, Berlin City has not demonstrated that they differ in "amount or degree." Id. "[J]obs may require equal effort in their performance even though the effort may be exerted in different ways on the two jobs." Id.

With regard to responsibility, Hammond has also provided enough facts to demonstrate that the responsibilities were substantially equal. "Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." Id. § 1620.17(a). As explained above, both guest services and sales positions involved supervising a staff, so both positions required accountability for the performance, discipline, and management of their staff members. The general sales manager may have had a greater supervisory role than the guest services manager, given that his staff included other managers, but the difference in degree of supervisory responsibility is ultimately a question of fact. See, e.g., Tomka, 66 F.3d at 1311 (holding that where supervisory skills overlap to some degree, "it is for the trier of fact to decide if this is a significant enough difference in responsibility"). All positions required reports to the general manager and attendance at management meetings with the general manager and the chief operating officer.

Finally, all of these positions occurred in similar working conditions. The working conditions standard is primarily concerned with actual surroundings and hazards, rather than departmental differences. See 29 C.F.R. § 1620.18(a). All of these positions maintained similar office space at the Berlin City dealership.

Considering all of the above factors, the court holds that Hammond has met her burden to defeat summary judgment by showing that her previous job as guest services manager was substantially equal to the general sales manager, sales manager, and finance manager positions.

Berlin City argues that summary judgment in its favor is still appropriate because the wage differential between Hammond's position and the others was justified by a factor "other than sex." 29 U.S.C. § 206(d)(1)(iv). Berlin City, however, offers a mere statement by its chief operating officer that the salaries for each management position were "commensurate with the qualifications for the position, the responsibilities entailed in each position, as well as the importance of the job function in the dealership." This statement is not enough to prove that the nongender factors the officer may have

9

considered were legitimate business factors, especially considering that Hammond has otherwise met her burden to show that the positions were substantially equal. In order to meet its burden on this affirmative defense, Berlin City must state the specific qualifications, responsibilities, and important aspects of each job and state how these factors correspond to the wage differentials. See, e.g., Belfi v. Prendergast, 191 F.3d 129, 138 (2d Cir. 1999). A trier of fact must ultimately determine whether Berlin City's alleged reasons for the wage differential were legitimate, unless there is no genuine issue of fact as to Berlin City's explanation. Because Berlin City has yet to offer a complete explanation, though, the court cannot apply the affirmative defense. Hence, Berlin City's summary judgment motion is denied with respect to Hammond's Equal Pay Act claims regarding the general sales manager, sales manager, and finance manager positions.

With regard to other positions at Berlin City, Hammond claims that further discovery might uncover additional similarities. Much of the discovery is incomplete in this case because of discovery disputes. She therefore seeks a Rule 56(f) continuance. Hammond should, however, be able to provide some information from personal knowledge about these other positions to demonstrate that they are substantially equal to the guest services position. Given that she has provided no such information, a Rule 56(f) continuance is unwarranted. See Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994) ("A court can reject a request for discovery, even if properly and timely made through a Rule 56(f) affidavit, if it deems the request to be based on speculation as to what potentially could be discovered."); Hudson River Sloop Clearwater, Inc. v. Dept. of Navy, 891 F.2d 414, 422 (2d Cir. 1989) (holding that Rule 56(f) motion was properly denied where plaintiffs had "reasonable access" to facts that were of "public nature"). Summary judgment is therefore appropriate for Berlin City with respect to Equal Pay Act claims regarding positions other than the general sales, sales, and finance managers.

Turning next to the Fair Employment Practices Act claims, Berlin City first argues that the alleged hostile work environment did not arise "because of . . . sex." 21 V.S.A. § 495(a)(1). Berlin City argues that according to federal caselaw regarding the federal fair employment practices statute, 42 U.S.C. § 2000e–2, where conduct related to a hostile environment arises out of a failed relationship, the conduct is not based on sexual discrimination but on the failed relationship. Applying this rule to this case, the alleged hostile environment is not actionable because it arose out of Hammond's failed relationship with McFarland, not because of Hammond's gender.

Federal courts have espoused a general rule that harassment based on a relationship gone sour may not constitute harassment because of sex. See, e.g., Succar v. Dade County Sch. Bd., 229 F.3d 1343, 1345 (11th Cir. 2000) (per curiam); Huebschen v. Dep't of Health & Soc. Servs., 716 F.2d 1167, 1172 (7th Cir. 1983). Courts have applied this rule where the facts demonstrate that no reasonable trier of fact could determine that the harassment which occurred was based on anything but a failed relationship. Compare Perez v. MCI World Com Communications, 154 F. Supp. 2d 932, 941–42 (N.D. Tex. 2001) (holding that former lover's scorn was not gender-based but based purely on animosity following failed relationship) with Green v. Adm'rs of Tulane Educ. Fund, 284 F.3d 642, 656–57 (5th Cir. 2002) (declining to apply Succar where evidence supported finding that harassment was based on plaintiff's refusal to continue having sexual relationship). Indeed, the Eleventh Circuit declined to extend its Succar holding to a case where a male supervisor engaged in a pattern of harassment and ultimately fired a female employee who terminated a relationship with him. See Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1185 (11th Cir. 2001). The court in Lipphardt held that a prior relationship is merely a factor to consider and noted that, unlike in Succar, the supervisor's harassment in Lipphardt was sexual in nature. Id. at 1188–89. Thus, the court held that "there is a point where inappropriate behavior crosses the line into [sexual] harassment." Id. at 1188. As the Maine District Court recently held in analyzing this rule the choice of "weapon" by an harassing party can determine the side of the line onto which a case falls. Oakstone v. Postmaster Gen., 332 F. Supp. 2d 261, 271 (D. Me. 2004).

Here, there exists a triable issue of fact as to whether the alleged hostile environment was more than the vengeful outbursts of a lover scorned. McFarland chose as his "weapon" constant phone calls and visits at Hammond's work station, asking Hammond to continue their relationship months after Hammond had broken it off. McFarland also continually accessed Hammond's e-mail account, reading her personal messages, and took roses and other mementoes from Hammond's desk. More than five months after Hammond had broken off her relationship with him, McFarland was still calling her on the phone at work making "kissing noises," left a Post-it note with a lewd message on her computer screen, and was making howling noises directed toward Hammond. This type of behavior might be considered a non-gender-based lovers' spat if it occurred shortly after the end of a relationship, but five months of continuous

harassment creates an issue of fact as to whether the harassment constituted a discriminatory hostile environment, regardless of the prior relationship.

Berlin City further argues that the type of behavior by McFarland was not sufficiently severe to constitute a hostile environment. To satisfy her burden in responding to a summary judgment motion, Hammond needs to establish a genuine issue of fact as to whether she was subjected to "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature," thereby creating an offensive working atmosphere. 21 V.S.A. § 495d(13); Allen v. Dept. of Employ. & Training, 159 Vt. 286, 290 (1992) (citing Meritor Savings Bank v. Vinson, 477 U.S. 57, 64–67 (1986)). Hammond has presented enough facts to create a genuine issue of material fact that McFarland's advances created an "offensive working atmosphere." As discussed above, the consistent advances, phone calls, visits, and e-mail interceptions could lead a reasonable trier of fact to find a hostile environment.

Berlin City next argues that even if McFarland's conduct created a hostile environment, Berlin City's remedial action in response to Hammond's complaints creates a defense against Hammond's claim. In a hostile environment sexual harassment claim, a plaintiff must demonstrate "a specific basis . . . for imputing the conduct that created the hostile environment to the employer." Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997). "When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" Id. (quoting Karibian v. Columbia Univ., 14 F.3d 773, 780 (2d Cir. 1994) (internal quotes omitted)). Courts judge an employer's reaction to sexual harassment complaints and protection of a complaining employee under a "reasonable care" standard. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 72–73 (2d Cir. 2000).

Here, Hammond's allegations call into question whether Berlin City's response to her complaints about McFarland's behavior was reasonable and adequate. She notes that Swartout was "hardly receptive" to her complaints and "frequently displayed a disinterested attitude and would not ask questions to elicit further information." Hammond also stated that Berlin City took no action beyond verbal warnings during a six-week period in which she made several complaints about McFarland to Swartout. It was not until Hammond demanded that Swartout take action that he issued a stern warning to McFarland. Even at that point, however, Swartout did not report the

12

harassment to upper management, and the harassment continued with little investigation or action. Later, when McFarland's harassment continued with the lewd Post-it note on Hammond's computer, Swartout apparently did nothing beyond a verbal warning. When McFarland called Hammond's home 18 times in a single day, on some occasions from his office, while Hammond was on vacation, Hammond reported the calls to Swartout and he again apparently did nothing beyond a verbal warning. It was not until several weeks later, after several more complaints, that Swartout reported the situation to Chief Operating Officer Roach, who began an investigation.

Berlin City disputes Hammond's allegations, arguing that she did not request any action beyond verbal warnings until after much of the harassment took place and that Swartout took immediate action, reporting the situation to Roach. This dispute is ultimately an issue for the factfinder. For the purposes of this motion, Hammond establishes her burden of showing a genuine issue as to whether Berlin City's response lacked reasonable and appropriate care under the circumstances.

Moving on to the retaliation claim, a prima facie case for retaliation requires (1) that a plaintiff engaged in protected activity, (2) that an employer was aware of the activity, (3) that the plaintiff suffered adverse employment action, and (4) that there was a causal connection between the protected activity and adverse employment action. Beckman v. Edson Hill Manor, Inc., 171 Vt. 607, 608 (2000) (mem.). The plaintiff's burden at this stage is "relatively light." Id. Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. Id. (internal quotes omitted). "If an employer meets this burden of production, the burden then shifts back to the plaintiff to prove by a preponderance of evidence that the employer's given reason is a pretext and not the true reason for the employment decision." Id.

Berlin City first argues that its actions did not rise to the level of "adverse employment action." The Vermont Supreme Court has not articulated a precise standard for determining what actions constitute "adverse employment actions," but the Court has held that they must be "sufficiently severe." See, e.g., id. at 609. Ultimately, as was the case in Beckman, the severity of the actions is a question of fact that is inappropriate for summary judgment except in cases where the employer's actions failed to reach a certain threshold level of significance. See, e.g., Murray v. St. Michael's College, 164 Vt. 205, 211 (1995) (holding that expression of anger and frustration over plaintiff's filing of

workers' compensation claim, efforts to persuade plaintiff not to appeal denial of benefits, reduction of plaintiff's duties, shift changes to include night shift, and unfairly low job evaluations were "plainly adverse" in summary judgment context).

Although federal courts have varying standards and the Vermont Supreme Court has not yet adopted one in particular, federal caselaw is still instructive in determining a threshold level of significance necessary to establish adverse employment action. See, e.g., Birch v. Cuyahoga County Probate Court, 392 F.3d 151, 169 (6th Cir. 2004) (holding that termination which was immediately rescinded and increased scrutiny over plaintiff's work did not amount to adverse actions); Stover v. Martinez, 382 F.3d 1064, 1072–73 (10th Cir. 2004) (holding that lack of promotion where plaintiff did not apply for promotion and lack of particular assignment did not amount to adverse action); Davis v. Dallas Area Rapid Transp., 383 F.3d 309, 319–20 (5th Cir. 2004) (holding that denial of promotion through rigged exam process meets prima facie case for adverse action).

Although courts must ultimately proceed on a case-by-case basis, Stover, 382 F.3d at 1071, a plaintiff must establish that the employer's action had some effect on the plaintiff's "pay, benefits, seniority, or responsibility," Horn v. Univ. of Minn., 362 F.3d 1042, 1046 (8th Cir. 2004).

> Not everything that makes an employee unhappy constitutes an actionable adverse employment action. A negative employment review, for example, is actionable only if the employer subsequently uses the evaluation as a basis to alter in a detrimental way the terms or conditions of the recipient's employment. Minor changes in duties or working conditions that do not result in materially significant disadvantage "do not meet the standard of an adverse employment action . . . ."

Henthorn v. Capitol Communications, Inc., 359 F.3d 1021, 1028 (8th Cir. 2004) (alterations in original, citations omitted) (quoting Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1016–17 (8th Cir. 1999)).

Here, Hammond provides sufficient facts to defeat summary judgment on the adverse action element. Although it might not be unreasonable for an employer to deny six weeks of leave, as occurred here, Berlin City's denial of Hammond's request after it had already approved of the leave suggests that it was changing a benefit Hammond had secured. Such a change in benefits creates a genuine issue of fact as to whether Hammond suffered adverse action, especially considering that the denial forced

14

Hammond, a single mother, to make last minute arrangements to secure child care. Berlin City's reprimand of Hammond, however, does not amount to adverse action, because it was immediately withdrawn and had no apparent effect on Hammond's employment status. Summary judgment is therefore appropriate on this particular claim of adverse action.[2]

Berlin City next argues that there was no causal connection between denying Hammond's six-week leave and the sexual harassment complaints. The court reiterates that a plaintiff has a light burden in establishing a prima facie case in a retaliation claim. Beckman, 171 Vt. at 608. With regard to causation, a plaintiff need not provide direct evidence, but "may establish a link indirectly by showing that the timing of [the protected activity] and the retaliatory action was suspect." Gallipo v. City of Rutland, 163 Vt. 83, 93 (1994); see also Robertson v. Mylan Laboratories, Inc., 2004 VT 15, ¶ 30 (holding that to show causation, "[p]laintiff must come forward with evidence to show that the circumstances surrounding [the alleged discrimination] permit an inference of unlawful discrimination"). In Gallipo, for example, the time between the plaintiff's protected activity and the alleged retaliation was seven months, but the Court held that the sudden change in the plaintiff's assignments and discipline after years of contrary action by his employer provided a genuine issue of fact as to whether the employer's adverse action was causally linked to the plaintiff's protected activity. 163 Vt. at 93.

Here, Hammond has met her initial burden to show a causal link between the denial of her unpaid leave and the protected activity. The denial occurred a mere two months after the complaint that initiated an investigation into McFarland's conduct. This is sufficiently close in time to create a reasonable inference that the complaint caused the denial of unpaid leave.

Berlin City also argues that it denied Hammond's leave for a legitimate and non-discriminatory reason. Berlin City states that it implemented more stringent scheduling

_____

[2] Hammond also raises other minor actions by Berlin City, such as Hammond being "taken to task" for her four day work weeks, her scheduling practices, her lack of lunch breaks, and her parking spot. These actions, however, did not significantly disadvantage Hammond and therefore do not rise to the level of adverse actions. Summary judgment is appropriate for these claims, as well.

and vacation requirements on all of its managers. Therefore, Berlin City argues, Hammond cannot demonstrate that Berlin City's reason is pretext for retaliation.

To show that an alleged legitimate reason for an employer's adverse action is pretext, a plaintiff can rely on her prima facie case "combined with sufficient evidence of pretext." Robertson, 2004 VT 15, ¶ 32 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)). On a summary judgment motion, courts must consider "a number of factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered' on a summary judgment motion." Id., ¶ 33 (quoting Reeves, 530 U.S. at 148–49).

Here, the court notes that more stringent policies which theoretically apply to all managers may still, in practice, be designed to have a disparate impact on a single manager. There is a reasonable inference that this was the case here, where Hammond's leave time was abruptly withdrawn about a month before it was to begin. If no other managers had requested such leave time, then Berlin City's universal policy changes appeared to affect Hammond alone. Moreover, Hammond alleged that Berlin City's policies appeared to have a particularly harsh application for her alone, as other employees at Berlin City noticed. Hammond has therefore presented enough facts to demonstrate a genuine issue as to whether Berlin City's alleged legitimate reason for its action was pretext.

With regard to Hammond's final claim of wage discrimination under the Fair Employment Practices Act, 21 V.S.A. § 495(a)(8), Berlin City argues that Hammond has failed to demonstrate the necessary discriminatory intent on Berlin City's part. Hammond argues that the surrounding circumstances of the different wages all support a finding of intent.

Fair Employment Practices Act claims require a plaintiff to show intentional discrimination, meaning that "the discrimination was a 'motivating factor' for the alleged unlawful action." Gallipo v. City of Rutland, 173 Vt. 223, 237 (2001) (quoting Knapp v. State, 168 Vt. 590, 591 (1998)). Courts follow a "shifting burden" approach similar to that described above with respect to retaliation claims. In other words, following a prima facie showing that the plaintiff received lower wages than similarly situated males and there was an inference of discrimination, the employer must provide a legitimate reason

16

for the wage differences. The plaintiff then must provide sufficient evidence that the employer's reason is pretext and that the wage difference was the result of "intentional discrimination." <u>Robertson</u>, 2004 VT 15, ¶¶ 25–27, 41 n.8; <u>Luciano v. Olsten Corp.</u>, 110 F.3d 210, 215 (2d Cir. 1997).

> When plaintiff proves that the explanations offered by her employer for wage disparity are false, such does not automatically mean that plaintiff has carried her burden of persuasion on the factor of intent. Something is still needed when the employer's reasons for its actions are shown to be pretextual, that is to say, it must also be shown that not only was the reason offered false, but that the real reason was discrimination.

<u>Belfi v. Prendergast</u>, 191 F.3d 129, 140 (2d Cir. 1999). But "[t]he factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will <u>permit</u> the trier of fact to infer the ultimate fact of intentional discrimination . . . ." <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511 (1993).

Here, Hammond has provided adequate evidence to create an issue as to whether Berlin City's reasons for its different wages were pretext and this evidence, along with her prima facie case, creates a rational inference of discriminatory intent. Hammond states that when Berlin City's upper management canceled her scheduled unpaid leave, Roach informed her that her position was as important as the general manager and service manager positions, so he could not permit her the leave time. This, along with other statements regarding the equal importance of guest services with other departments at Berlin City, provide an inference for a trier of fact to determine that Berlin City's reasons for different wages were pretext for discrimination. Therefore, summary judgment is denied with respect to Hammond's Fair Employment Practices Act claim for unlawful wage discrimination.

Finally, the court notes that prior to this summary judgment ruling, the court had denied Hammond's motion to compel, holding that the court would defer ruling on the discovery issues until after its disposition of the summary judgment motion. In light of the instant entry, the parties shall attempt to resolve any remaining discovery disputes through a Rule 26(h) conference and, if they cannot resolve their disputes, file appropriate motions to the court.

17

ORDER

For the foregoing reasons, Berlin City's summary judgment motion is GRANTED in part and DENIED in part, consistent with this entry.


Dated at Burlington, Vermont, March 10, 2005.


_____/s/_____
Richard Walsh Norton      Judge